In the Matter of the Application of CONTINENTAL GUARANTY CORPORATION, Appellant, for an Alternative Mandamus Order against CHARLES L. CRAIG, as Comptroller of the City of New York, and Others, Respondents. (Appeal No. 1).

First Department, March 13, 1925.

Municipal corporations — mandamus to compel comptroller of city of New York to audit and pay claim approved by Transit Commission and assigned to petitioner — said claim is cost of production of motion picture film ordered by Transit Commission entitled " Standing Room Only "— said picture purports to portray history of transit in New York city and existing conditions together with financial statements and maps — error for court after reserving decision on motion to set aside general verdict of jury to grant said motion and direct verdict in favor of defendants at next term of court — verdict of jury in favor of petitioner was proper — Transit Commission had power, under Laws of 1921, chapter 134, to contract for picture — verdict of jury reinstated.

On the trial before a jury of the issue raised on an alternative mandamus order to compel the comptroller of the city of New York to audit and pay a claim approved by the Transit Commission for the preparation of a motion picture ordered by the Transit Commission, it was error for the court, after reserving decision of a motion to set aside the general verdict of the jury, to grant said motion and to direct a verdict in favor of the defendant at the next Trial Term; the court had no power to make the direction after the close of the term and in the absence of the jury.

The issue raised by the defendants, which was in effect that the motion picture, which depicted a history of transit in New York city and the present congested conditions of traffic together with a financial statement concerning the subways and street railways in New York city and maps, was contracted for by the Commission for the purpose of influencing the electorate to vote the Republican ticket at the election so that that ticket would be elected and the Commission be retained in office, was properly solved by the jury in favor of the petitioner, for there was nothing outside of suspicion, presumption or disapproval of the policy and methods of the Transit Commission on which to rely to controvert testimony offered on its behalf as to its good faith in making the contract in question, supplemented as it was by the most forceful proof of all — the view of the film itself — and, therefore, the verdict of the jury should not have been set aside and is reinstated by the Appellate Division.

The Transit Commission had the power under chapter 134 of the Laws of 1921 to contract for the production of the motion picture in question, since that

Matter of Continental Guaranty Corp. *v.* Craig.  No. 1.  **237**

App. Div. 236]          First Department, March, 1925.

statute not only imposed upon the Commission the duty of preparing a plan for the relief of the transit conditions in New York city but went further and placed upon it the burden of trying by all possible means to obtain the acquiescence of the corporations owning the railroads and the co-operation of the city itself, and the use of this motion picture was a very proper way of obtaining that acquiescence and that co-operation.

Burr, J., dissents.

Appeal by the petitioner, Continental Guaranty Corporation, from an order of the Supreme Court, made at the New York Trial Term and entered in the office of the clerk of the county of New York on the 2d day of May, 1924, granting defendants' motion to set aside the verdict of the jury in favor of the petitioner and to direct the verdict in favor of the defendants.

*Leo Oppenheimer* [*Milton P. Kupfer* of counsel], for the appellant.

*Clarence J. Shearn*, for George McAneny and others, constituting the Transit Commission, *amicus curiæ*.

*George P. Nicholson, Corporation Counsel* [*Elliot S. Benedict* of counsel; *John F. O'Brien* and *Joseph L. Pascal* with him on the brief], for the respondents.

Dowling, J.:

Appellant's assignor, Baumer Films, Inc., in March, 1922, entered into an agreement with the Transit Commission whereby it was to produce and furnish to the Commission a negative and three positive prints of a motion picture film entitled " Standing Room Only," such film to consist of four 1,000-foot reels, for which it was to receive the sum of $8,000. The picture was taken and the films produced in accordance with the agreement and delivered to and accepted by the Commission, which duly audited the bill sent to it by the Baumer Films, Inc., and transmitted such bill to the defendant comptroller for audit and payment pursuant to law, who refused and neglected so to do. The picture was shown as early as May 5, 1922, and as late as December 13, 1922. There is in evidence a list offered by defendants showing that the picture had been exhibited in 476 theatres in New York city on various dates from September 4 to November 22, 1922. The contract made by the Commission with the American City Bureau Film Service for the exhibition of the picture in the 250 theatres under the control of the Theatre Owners' Chamber of Commerce and located in New York city was made on August twenty-third, and provided that the showing should begin at once and terminate with the week beginning October 8, 1922. This agreement superseded an earlier one dated July 5, 1922. Owing to the limited number of prints available, the contract was not completed when in December further showings

**238**  MATTER OF CONTINENTAL GUARANTY CORP. *v.* CRAIG.  No. 1.

First Department, March, 1925.                    [Vol. 212

of the film were suspended, because the comptroller refused to pay any bills therefor.

The appellant herein, as assignee of the Baumer Films, Inc., applied for and was granted a peremptory mandamus order directing the respondents to audit and pay to the petitioner its claim for $8,000. Upon appeal taken by the city officials to this court, so much of the order as granted the motion for a peremptory order was reversed, and an alternative order of mandamus was directed to be issued. (207 App. Div. 261.) The majority opinion of the court upheld the right of the city comptroller to make an audit of the bill; and in conclusion Mr. Justice MARTIN said (at p. 268):

" Where it appears that there is a real controversy, a peremptory order should be denied. Such a course is found to protect those charged with disbursing the public funds and at the same time bring about a just result.

" While the comptroller may not thwart the efforts of the Transit Commission in its endeavor to properly function, at the same time the Commission may not compel the comptroller to pay claims which have been improperly incurred or which are in payment for work done under a contract which was not for a public purpose and chargeable to the city.

" Under the circumstances the claimant should have been given an alternative order, or relegated to an action at law, in order that the legality of the claim may be determined before the funds of the city are disbursed therefor.

" The order should be reversed, with ten dollars costs and disbursements, and the motion for a peremptory mandamus order denied, with fifty dollars costs, and an order entered permitting an alternative order to issue."

The comptroller's answer to the petition had stated in substance that the contract between the Baumer Films, Inc., and the Transit Commission was in excess of the powers of the Commission and not entered into to further a municipal or public purpose, but was in furtherance of a scheme to influence public opinion in favor of the candidate for Governor for whom votes were to be cast at the impending election in 1922, and at whose hands the Transit Commissioners held their offices, and to promote the success at said election of the political party in pursuance of whose policy in relation to transit matters in New York city the Commissioners would be permitted to continue in office, and to defeat the policy of the political party whose success at election would be likely to cause them to be deprived of their offices.

The alternative order having been granted, the issue thus raised went to trial. The effort of the defendants was to show that the

Transit Commission was not actuated by a proper purpose in ordering and exhibiting the film, and that its action was not taken to further a public purpose properly chargeable to the city of New York, but that it was solely actuated by political considerations, and that the film was designed to aid one political party in the approaching State elections at the expense of the other. In the effort to show this, the platforms of the Republican and Democratic parties adopted at their respective conventions held in September, 1922, were offered and received in evidence, the former commending the Transit Commission and its actions and defending its creation, the latter pledging the party to a repeal of the statutes creating divided responsibility in the supervision of public utilities and the delegation of sole power to municipalities to control public utilities operating wholly within their limits. These platforms were adopted in the last days of September, while the contract for the making of the films was made in March and those for their exhibition were made in July and August.

The film was exhibited to the jury by actual projection upon a screen in the courtroom. It has also been exhibited for view by the members of this court. It is described in a way in the opinion of the learned trial court upon the decision of the motion to set aside the verdict herein. As epitomized by the appellant herein, the film consists of two main divisions, the first denominated " The Problem," and the second " Its Solution." Briefly summarized, it shows a history of transit in New York city from the original horse-car days, through the construction of cable cars, electric surface cars, elevated cars and subways, in connection with, and with reference to, the growth of the city and the movement of population therein; it then portrays, by means of actual picture reproduction (the first of its kind ever made) the existing conditions of transit at various hours of the day in various parts of the city, including Grand Central Station, Canal street, Brooklyn bridge, Times square, Wall street and Borough Hall, and analyzes the reasons for the existing congestion and legislatively-declared emergency; it then shows the various items of transportation costs and the apportionment of the fare paid by passengers among those items in detail; and, finally, shows the proposed plan of the Transit Commission, the body duly authorized by the Legislature for that purpose, for the amelioration and remediation of the existing conditions. The proposed transit plans are set forth in a series of maps which appellant claims have been executed on the film with unusual clarity and accuracy and are quite understandable. At least the jury so found them. For the purpose of making the film suitable for public presentation, it contains two allegorical char-

acters, one of them " Father Knickerbocker," and another who represents the average user of transit facilities, and who is called " Mr. S. Trapp Hanger." As testified to by Commissioner Harkness, and as found by the jury, the purpose of the Commission in including these allegorical characters was to make the film suitable for public presentation. Towards the conclusion of the film, it contains a request for suggestions and comments from the public as a preliminary (as testified by one of the Transit Commissioners) to the holding of public hearings upon the remedial plans.

The learned trial court denied a motion to dismiss the petition herein made at the close of petitioner's case, upon the ground that the Transit Commission had no power under the law to enter into the agreement sued on. Decision was reserved upon motions to dismiss made at the close of defendants' case and also after rebuttal, as well as upon a motion for a directed verdict made at the latter time. The case was then submitted to the jury in a charge which virtually resolved the issue into the question of whether the film had been made for use for political purposes or was in good faith intended to be used for public purposes and to aid in carrying out the plans of the Commission for the city's benefit. The learned trial court charged the jury:

" The Corporation Counsel claims that this picture was made and distributed as propaganda on behalf of the Rapid Transit Commission to save their continuance in office by election of candidates of the party that announced that the Rapid Transit Commission was theirs and that Governor Miller approved of them, and they should approve of Governor Miller and his candidates for office.

" The Rapid Transit Commission has very broad powers. All expenses incidental to the management and the conduct of the work entrusted to that powerful Commission must be paid by the Comptroller of the City of New York, but when the law says that the City's Comptroller, who has often been referred to as the watchdog of the City's treasury, sees something passing through in the way of vouchers, which of itself calls his attention to the fact possibly that it has no connection with the building of subways or making of plans for the modification of subways — he has a perfect right to object to its payment and refuse to pay it, and then the matter passes to the courts for final adjudication; and that question is now here. No one will contend that if a voucher passed through from the Rapid Transit Commission to the Comptroller of the City of New York for three pairs of dancing pumps for the Transit Commissioners, that the Comptroller would not have had a right to refuse that warrant, casting it aside, and refuse to pay it, and no court would have justified the payment of that voucher.

" That is the kind of a bill that the Corporation Counsel claims is this bill for the moving pictures. Disabuse your minds of politics entirely and just consider the situation.

" The Rapid Transit Commission had a scheme and plan for the improvement of Rapid Transit for the City of New York. We do not care whether the Commission was right or wrong. The law told them what they should do. The law said in Section 107 what the procedure under the plan of readjustment should be. They shall prepare a plan, and upon the completion of the plan, but before finally adopting the same, the Commission shall hold a public hearing thereon. They shall, at the same time, transmit a copy thereof to the local authority of the City, which means the Board of Estimate of the City of New York, and to each of the railroad companies which owns or operates any of the railroads included therein, with a request for a statement of the views of such local authority and such railroad companies. Then the Commissioners may require the local authority and the railroad companies to transmit to them their views, and thereafter the Commission is to finally pass on the plan, and they have a right to modify the plan in accordance with suggestions.

" The Corporation Counsel's claim here, on behalf of the Comptroller, is that there is no requirement that the Rapid Transit Commission should give an explanation or an educational picture to the people of the city, because the law has provided just what officials and who the individuals were who should pass on and adopt the plans, and the Corporation Counsel argues from that fact, that the only object that could have been in the minds of the Rapid Transit Commission when they had this picture prepared, was to influence the voters to vote for those who would retain them in office. Propaganda on public questions is perfectly proper. All public officials, with the exception of the judiciary, take an active part in public questions, and even delight in attending meetings of citizens and public bodies where they explain the various methods by which public business can be carried on, and no one has any right to object to that. No one has any right to object to the same action being taken by the Rapid Transit Commission if they wish to attend meetings and address the citizens to induce their favorable opinion of the work that the Commission is doing; but the objection made to this bill is that this bill was such propaganda for the benefit of the Rapid Transit Commission, and to assist them in remaining in office so that they could carry out their plans. The bill has been presented to the city for payment, and although the city authorities and the people of this city have, as you have

heard both counsel say, differed most bitterly with the Rapid Transit Commission as to what should be done, claiming vociferously at every opportunity that it was home rule they wanted, and they wanted to control this whole matter themselves, they find this bill presented to their financial officer, with a demand for its payment — and he has refused payment on the ground that it is not one of those bills that can be regarded as one of the expenses of the Rapid Transit Commission — it goes without saying that spending money for the object of maintaining themselves in an official position is a very strictly personal matter, and all such expenses should be paid from their own pockets and not from the city treasury. Even judicial officers have to pay their own expenses in obtaining re-election from time to time."

And at the request of appellant's counsel, the learned trial court charged: "Request No. 5. Therefore, the burden of proving that the Transit Commission acted in bad faith and for political purposes rests upon the respondents."

And again he charged: "Request No. 6. If, in making the contract evidenced by plaintiff's Exhibits 3 and 4, the Transit Commission was exercising its lawful powers (and not acting in bad faith or for purely political purposes) it is not within the province of the Comptroller to refuse to pay petitioner's claim merely because, in his personal opinion, the making of a contract for the production of a motion picture film may seem unwise. The wisdom of making the contract in question is confided solely to the lawful exercise of the discretion of the Transit Commission, the lawfully constituted contracting body.

"The Court: I so charge, in case the payment was a proper expenditure of the Rapid Transit Commission."

At the conclusion of a charge, which is not claimed to have been unduly favorable to appellant, the jury found a verdict for the petitioner. This verdict was received on March 5, 1924. The court then took under advisement a motion to set aside the verdict on the ground that it was against the evidence, against the weight of the evidence, against the law and on the exceptions taken. Attention was called by defendants' counsel to the fact that the court had reserved decision on a motion to direct a verdict in their favor, and also on a motion to dismiss the petition.

Thereafter, on April 4, 1924, the learned trial court handed down an opinion announcing his conclusion not only that the verdict should be set aside, but that a verdict should be directed in favor of defendants; and an order was thereafter entered on April 30, 1924, whereby it was

"Ordered, that the said verdict heretofore rendered in favor of

the relator, be and the same hereby is set aside upon the ground that the said verdict is contrary to the law and contrary to the evidence; and it is further

" Ordered, that defendants' motion for a direction of a verdict in their favor, be and the same hereby is granted and a verdict is hereby directed in favor of the said defendants."

In so far as the learned trial court undertook to direct a verdict for defendants, he was without power so to do. The order for a directed verdict was not made until the next term of court following that at which the case was tried. The verdict of the jury was a general, not a special one. No jury was present, nor was a verdict ever rendered by a jury as directed by the court. This constitutes a fatal defect.

In *Gilbert* v. *Finch* (72 App. Div. 38; affd., 173 N. Y. 455) Mr. Justice McLAUGHLIN said: "A verdict contemplates, and necessarily involves, the presence of both court and a jury, and whenever it is directed it is absolutely necessary that both be present. There can, from the very nature of things, be no such thing as a verdict directed unless both the court and jury are present, because in such verdict there is involved an order by the court and an execution of the same by the jury. Once a jury has been discharged, the court has no power to direct a verdict, because there is not only no one to direct, but no one to execute the direction. Therefore, the exception taken to the direction in this case would, in and of itself, necessitate a reversal of the judgment appealed from, were it not for the fact that it was conceded upon the argument before us that the objection made and exception taken were not directed to the practice adopted; and in connection with this concession, a request was made on the part of counsel for both of the parties that the error be overlooked and the case decided upon the merits."

No such request is made in the present case, and the exception taken sufficiently raises the question.

This court had already held that there was an issue to be tried out herein. That issue was found by the jury in favor of petitioner, and properly so. Outside of suspicion, presumption or disapproval of the policy and methods of the Commission, there was nothing on which to rely to controvert the testimony offered on its behalf as to its good faith in making the contract in question, supplemented as it was by the most forceful proof of all — the view of the film itself. On the issue directed by this court to be determined on the alternative order, the verdict of the jury was correct, and should not have been disturbed by the trial court.

The respondents now urge that the purchase of the film was not a public city purpose because it was not a necessary incident to the

Commission's statutory powers, and that the securing of public support for its plans of transit relief was not a proper motive for incurring the indebtedness in question.

It is quite true that the statute creating the Transit Commission does not in terms authorize the expenditure in question. But the provisions of the statute (Laws of 1921, chap. 134, § 73 *et seq.;* Public Service Commission Law, § 4-a, as added by Laws of 1921, chap. 134; Id. § 5-a, added by Laws of 1921, chap. 134, as amd. by Laws of 1921, chap. 335; Id. § 14, as amd. by Laws of 1921, chap. 134; Id. art. 6, added by Laws of 1921, chap. 134, as amd.) are most unusual and sweeping in the powers and duties conferred upon the Commission, and must be deemed to carry with them every thing incidental to the execution of such powers and the performance of such duties. Thus section 106 of the Public Service Commission Law (added by Laws of 1921, chap. 134, as amd. by Laws of 1921, chap. 335, and Laws of 1922, chap. 153) expressly commands the Transit Commission, after due investigation and study, to prepare a plan of readjustment for the relief of the emergency conditions in transit facilities thereby declared to exist, and for the improvement of transit generally. The plan thus ordered by the Legislature to be prepared by the Commission was, by the terms of the statute, to embody provisions which, in the judgment of the Commission, would accomplish (1) combination, rehabilitation, improvement and extension of existing railroads so that service may be increased and improved; (2) the receipt by the city as soon as practicable of sufficient return from the operation of railroads so as to exempt the rapid transit railroad construction bonds in computing the debt-incurring power of the city; and (3) the assuring to the people of the city the continued operation of railroads at the present or lowest possible fares consistent with the just valuations of the railroads and their safe and economical operation. Provision for tort creditors in the readjustment was directed.

Among the important suggested readjustments of the transit lines was the direction of the statute to incorporate in this plan of readjustment the acquisition by the city of title to such railroads not then municipally owned as the Commission might deem advisable, which necessarily embraced the consideration of means of taking care of outstanding securities issued by such roads, the valuation of physical properties and the details of managing and operating the combined railroad system after such reorganization and adjustment.

The statute not only imposed upon the Commission the duty of preparing such a plan, but went further and placed upon them the onus of trying by all possible means to obtain the acquiescence

Matter of Continental Guaranty Corp. *v.* Craig.  No. 1.  **245**

App. Div. 236]          First Department, March, 1925.

of the corporations owning the railroads and the co-operation of the municipality itself.

By section 107 of the Public Service Commission Law (as added by Laws of 1921, chap. 134) the Commission is commanded, upon completion of such plan, but before its final adoption, to hold public hearings thereon, and transmit copies of the plan to the railroad companies affected and to the municipal authorities with an idea of obtaining the views and suggestions of each.  After such exchange of views and the making of such modifications in the plan as the Commission deems advisable, the plan shall be formally adopted and the railroad companies required to elect whether they will voluntarily join therein.  But before finally carrying out the scheme and forcing it upon the municipal authorities, the Commission was directed to hold a further public hearing thereon, and, in addition, to transmit the completed plan with the necessary contracts to carry it into effect, to the local authority of the city and request approval thereof.  If not acceptable to the local authority, the latter is directed to return the same to the Commission with the reasons for disapproval.  The Commission, after considering the criticisms made, and after holding still further public hearings on the matter and making such changes as it deems advisable to meet the criticisms made, shall resubmit the contracts to the city authorities for approval.  It is not until all these means thus provided for an amicable adjustment have been exhausted that the Commission is authorized to adopt the plan regardless of the consent of the local authorities.

The provisions of the statute just summarized show conclusively that the Commission was required by law to take all possible steps to have its plan approved by the railroads, the city authorities and the public.  It was not to take the best plan it could conceive and force it upon those most concerned, willy-nilly.  Every reasonable means to obtain the voluntary approval of the local authorities was provided for, and a full disclosure to the public of the plan and its effect was directed.

With the duty thus devolved upon it of taking not only the municipal authorities and the railroad companies, but the public as well, into its confidence and endeavoring to obtain the support of all these elements for its plans for remedying existing transit conditions for the benefit of the city at large, it seems to me no one could justly have objected to the Commission's seeking to carry out its legislative mandate not only by public hearings but by the dissemination of literature, whether in the shape of reports (illustrated as many municipal reports now are), pamphlets or other printed appeals.  From this to the modern method of appeal

— by way of the screen — is but a step. I believe the learned counsel for petitioner is correct in his contention that the dissemination of information to the public by public bodies, by means of motion pictures, is not only not inherently improper but is, in the present day, a recognized method of public education; that the Legislature specifically imposed upon the Transit Commission the duty not only of preparing a plan for transit readjustment, but also of holding public hearings thereon; that the education of the public upon conditions presently existing, and upon the proposed plans of the Transit Commission for their amelioration, as preliminary to public hearings, was not only the power, but also the imposed duty of the Transit Commission; and that the jury having found the film to be not improper in content, nor actuated in its production or exhibition by improper motives, the petitioner's bill, as vouched by the Transit Commission, should have been paid.

The order appealed from should, therefore, be reversed, with costs to the appellant, and the verdict of the jury reinstated.

Clarke, P. J., Merrell and McAvoy, JJ., concur; Burr, J., dissents.

Order reversed, with ten dollars costs and disbursements, and the verdict of the jury reinstated.

---

In the Matter of the Application of Continental Guaranty Corporation, Appellant, for an Alternative Mandamus Order against Charles L. Craig, as Comptroller of the City of New York, and Others, Respondents.  (Appeal No. 2.)

First Department, March 13, 1925.

See headnote in *Matter of Continental Guaranty Corp.* v. *Craig (ante,* p. 236).

Appeal by the petitioner, Continental Guaranty Corporation, from an order of the Supreme Court, made at the New York Special Term and entered in the office of the clerk of the county of New York on the 18th day of June, 1924, granting defendants' motion for a final order of dismissal of this proceeding and of an alternative mandamus order issued herein and for judgment in favor of the defendants on the merits.

*Leo Oppenheimer [Milton P. Kupfer* of counsel], for the appellant.

*Clarence J. Shearn,* for George McAneny and others, constituting the Transit Commission, as *amicus curiæ.*

*George P. Nicholson, Corporation Counsel [Elliot S. Benedict* of counsel; *John F. O'Brien* and *Joseph L. Pascal* with him on the brief], for the respondents.