In the Matter of the Application of the CONTINENTAL GUARANTY CORPORATION, Respondent, for an Order of Mandamus against CHARLES L. CRAIG, as Comptroller of the City of New York, et al., Appellants.

New York city — Transit Commission — without authority to incur indebtedness to instruct public on transit matters except as limited by statute — manufacture and exhibition of motion picture showing development of rapid transit and problems connected therewith unauthorized — mandamus to compel payment properly dismissed.

Chapter 134 of the Laws of 1921, which charges the Transit Commission of the State of New York with the duty of devising some scheme or plan for the improvement of transit conditions in the city of New York and authorizes said Commission, after submitting said plan to the interested railroads and to the city and after prescribed public hearings to adopt it, places no duty upon the Commission to create public opinion or to instruct the public on transit matters at public expense except by distribution of copies of drafts of the

proposed contracts as provided in section 37 of the Rapid Transit Act (L. 1891, ch. 4, amd. L. 1917, ch. 525). There was no justification, therefore, for manufacturing and exhibiting a motion picture to inform the public regarding the development of transit within the city of New York and the difficulties and problems connected with the present systems and the methods proposed to remedy them.   The law creating the Commission has limited as well as given power and has placed a limitation upon the cost of the dissemination of knowledge. An expenditure for such a film production was unauthorized, the Commission had no authority to incur an indebtedness therefor and an alternative order of mandamus to compel payment by the city authorities was properly dismissed.

*Matter of Continental Guaranty Corp.* v. *Craig*, 212 App. Div. 236, reversed.

(Argued May 5, 1925; decided June 2, 1925.)

Appeal from an order of the Appellate Division of the Supreme Court in the first judicial department, entered March 19, 1925, which reversed an order of the court at a Trial Term setting aside a verdict in favor of petitioner and directing a verdict in favor of defendant after trial of the issues raised in a mandamus proceeding, reinstated the verdict in favor of the petitioner and granted its motion for a peremptory order of mandamus directing payment of the petitioner's claim.   The notice of appeal brings up for review an intermediate order directing the issuance of an alternative order of mandamus.

*George P. Nicholson, Corporation Counsel (John F. O'Brien, Elliot S. Benedict* and *Joseph L. Pascal* of counsel), for appellants.   No power is expressly conferred by chapter 134 of the Laws of 1921, or any other statute, upon the Transit Commission to contract for the production of moving picture films, in order to secure popular support for its contemplated plan, nor is such a power necessarily incidental to any power expressly conferred. (*Village of Fort Edward* v. *Fish*, 156 N. Y. 363; *City of Buffalo* v. *Stevenson*, 207 N. Y. 258; *People ex rel. City of Olean* v. *W. N. Y. & P. T. Co.*, 214 N. Y. 526; *Schieffelin*

**356** Matter of Continental G. Corp. *v.* Craig.

v. *Hylan,* 236 N. Y. 254; *Moynahan* v. *City of New York,* 205 N. Y. 181; *Stetler* v. *McFarlane,* 230 N. Y. 400; *People ex rel. Rand* v. *Craig,* 231 N. Y. 216; *Matter of Village of Kenmore,* 59 Misc. Rep. 388; *Wakefield* v. *Brophy,* 67 Misc. Rep. 298; 207 N. Y. 772; *Hodges* v. *City of Buffalo,* 2 Den. 110; *Gamble* v. *Village of Watkins,* 7 Hun, 448.)

*Milton P. Kupfer* and *Leo Oppenheimer* for respondent. The dissemination of information to the public by public bodies, by means of motion pictures, is not only not inherently improper, but is, in the present day, a recognized method of public education. The Legislature specifically imposed upon the Transit Commission the duty not only of preparing a plan for transit readjustment, but also of holding public hearings thereon. The education of the public upon conditions presently existing, and upon the proposed plans of the Transit Commission for their amelioration, as preliminary to public hearings, was not only the power, but also the imposed duty of the Transit Commission. (*Green* v. *Frazier,* 253 U. S. 233; *Schieffelin* v. *Hylan,* 236 N. Y. 254, 262.)

*Clarence J. Shearn* for Transit Commission, *amicus curiæ.* The power to make the contract here involved is conferred upon the Commission by chapter 134 of the Laws of 1921. (*City of N. Y.* v. *Street,* 91 App. Div. 206; 180 N. Y. 507; *Oscorr & Rug Co.* v. *City of Little Falls,* 77 App. Div. 592; 178 N. Y. 622; *People ex rel. Cranford* v. *Coler,* 26 Misc. Rep. 509; *People ex rel. Wells & Newton* v. *Craig,* 232 N. Y. 125; *People ex rel. Fleishman* v. *Graves,* 118 Misc. Rep. 214; 235 N. Y. 84; *People ex rel. Shearn* v. *Craig,* 207 App. Div. 849; 237 N. Y. 614; *People* v. *Kelly,* 76 N. Y. 475; *Horton* v. *Andrew,* 191 N. Y. 231; *Matter of McAneny* v. *Bd. of Estimate,* 232 N. Y. 377; *Sun P. & P. Assn.* v. *New York,* 152 N. Y. 257; *Admiral Realty Co.* v. *New York,* 206 N. Y. 110; *New York* v. *Brooklyn City R. Co.,* 232 N. Y. 463.)

CRANE, J.  On the 4th day of March, 1922, George McAneny, Le Roy T. Harkness and John F. O'Ryan constituted the Transit Commission of the State of New York appointed by and acting under the authority of chapter 134 of the Laws of 1921.  Charged with the duty of devising some scheme or plan for the improvement of the transit conditions in the city of New York, the Commission entered into a contract for the manufacture and production of a film picture known as 'Standing Room Only," which would in its estimation picture some of the difficulties and problems of passengers in the Greater City.  Four one-thousand foot reels were made by Baumer Films, Inc., under this contract, and the picture was thereafter exhibited many times in about one hundred and fifty theatres throughout the city.  The contract price for the film was $8,000.  The bill for this amount was duly audited by the Transit Commission and transmitted to the comptroller of the city for audit and payment, which have been refused.  The claim of the comptroller has been principally that the charge was not one allowed by law, and that the Transit Commission had no authority to incur such indebtedness.

The claim of the Baumer Films, Inc., having been assigned to this relator, the Continental Guaranty Corporation, a mandamus was applied for to compel payment.  In the first instance, a peremptory mandamus was directed, but on appeal the order was reversed and an alternative mandamus directed.  (*Matter of Continental Guaranty Corp.* v. *Craig,* 207 App. Div. 261.) On the trial of the alternative writ the jury found a verdict for the relator which the trial justice set aside directing a verdict for the defendants and dismissing the alternative writ.  On appeal the Appellate Division has reversed the order of. the Trial Term and reinstated the verdict in favor of the relator by order dated March 13, 1925.  By another order of the same date a final peremptory mandamus order was issued directing the defendant and

the proper city authorities to audit and pay the petitioner's claim of $8,000 by executing and countersigning the proper warrant therefor.

The appeal to this court presents the single question whether chapter 134 of the Laws of 1921, from which the Transit Commission derives all the power which it possesses, justifies this expenditure for a film production such as here in question.

Before attempting to analyze the law, it is necessary to understand in some detail the object which the Commission had in view in the manufacture of this film, and then to visualize the picture. Mr. Harkness said:

" My purpose of taking up the matter of this motion picture of transit was that transit was an exceptionally complicated thing in New York, and it is very hard to get the people to understand it without the most intense sort of study. We were printing any number of reports, but I wanted to get something which would show the facts, so the public would look at it and get in some easily understood form, the truth and facts of the transit matter. I wanted to reach down to the public and let the public know what the Transit Commission was doing. * * *

" That (the motion picture) is the same principle as going out, as we have repeatedly, and speaking before citizens' associations, on invitations."

The picture, which takes one hour to one hour and a half to be seen, was exhibited before the Trial Term and also before the Appellate Division. While we have not seen the picture, a description of it contained in the record is amply sufficient to present the question of law which we are to determine. That description reads as follows:

" It consists of four separate reels of 1,000 feet each. Reel 1 begins by showing the crowded condition on a subway platform. It shows a person riding on horseback through the woods, supposedly in the early history of

the city.  This is followed by a picture of the horse car thereafter used, and then is shown the elevated railroad, and then the beginning of the subway construction, and busses traveling through Riverside Drive.  Next is shown a picture of Father Knickerbocker granting franchises to different railroads.  Mr. S. Trapp Hanger is shown leaving his home and entering a subway station.  Then he is shown shoved about in the crowd at Times Square. Reel 2 begins by showing the crowded subway conditions. Then it shows the Equitable Building.  Mr. S. Trapp Hanger complains to Father Knickerbocker about the crowded condition of the subway by sending him the following letter: ' The public is sick and tired of being put off any longer.  It wants to know what becomes of the nickel it pays for transit.  It certainly does not go towards improving the service.'  Father Knickerbocker shows what becomes of the nickel fare.  This, by diagram, shows that the city has a deficiency of $10,000,000 from the operation of the subway each year.  This deficiency must be made good by increasing the taxes upon homes. Next is shown Father Knickerbocker receiving a letter which reads as follows: ' Please remit to your bankers $10,000,000 interest on money you borrowed to build subways.'  Next is shown Father Knickerbocker sending a letter to the landlord about raising the taxes, which reads as follows: ' On account of not being able to meet the annual interest on the subway lines it will be necessary for me to raise your taxes proportionately.'  Then is shown a picture of Mr. S. Trapp Hanger receiving a letter from his landlord which reads as follows: ' On account of an increase in taxes I pay I must increase your rent.'  And then is shown Mr. S. Trapp Hanger traveling from Prospect Park West and the Plaza to Woodhaven, a distance of four miles, wherein he is compelled to use three cars and pay three nickels, and he says: ' This is what they call the nickel fare.'  Then he is shown telephoning to Father Knickerbocker, complaining of the

fact that he has been compelled to pay three fares for traveling the distance of four miles, and Father Knickerbocker answers him by inviting him to visit him and he will there show him the plans of the Transit Commission which will remedy existing conditions. Reel 3 shows Mr. S. Trapp Hanger visiting Father Knickerbocker. Father Knickerbocker shows him the plans of the Transit Commission and now shows him what will become of the nickel fare if the plans of the Transit Commission are carried out. It shows the division of Mr. S. Trapp Hanger's nickel so as to turn the deficiency of millions into a surplus sufficiently large for the building of additional subways. Father Knickerbocker also shows that the free transfer system will be reinstated by the Transit Commission. Reel 4 shows diagrams of the existing transit facilities and what the Transit Commission proposes to do with the existing lines by consolidation and by removing some altogether. This is done by flashing upon the screen a bewildering series of maps of the city of New York representing all the surface, subsurface and overhead railroads in the city at the present time as well as those proposed by the Transit Commission. The screen picture of a nickel shows just the proper proportions into which it must be divided to pay expenses, remove the deficit and produce the surplus."

We gather, therefore, from the picture itself as thus described and from the statement by the Commission that the object of manufacturing and exhibiting this motion picture was to inform the public regarding the development of transit within the city of New York and the difficulties and problems connected with the present systems, and the methods proposed to remedy them. In a word, the Transit Commission has conceived it to be its duty to instruct the public at public expense regarding the " exceptionally complicated " problems of transit. That, these problems are exceptionally complicated is matter

I think of common knowledge. How far the public at large will ever understand them is a matter of speculation, for the problems, it must be conceded, are those requiring engineering and financial skill and experience for solution. With these matters the public generally are not conversant and are not expected to be. The act creating the Transit Commission I think clearly indicates that these problems are to be dealt with and solved by the experts in these matters after study, advice and public hearings, and there is no intimation in the act itself that the public at large is expected to give or withold its approval. There are some matters in city government which we as a public must confide to the judgment and the wisdom of men trained and skilled for the task. Everything cannot be intelligently settled by a majority vote. Cost of production, durability of material, the inherent strength of construction do not fluctuate with public sentiment. There is nothing so far as I can see in chapter 134 of the Laws of 1921 that places any duty upon the Transit Commission to create public opinion or to instruct the public on transit matters at public expense, except by the methods provided in the act to which I shall refer presently. If this were not so, there would be no limit whatever upon the powers of this Transit Commission, as the matter of educating the public is in itself as difficult a problem as any evolved out of transit.

The Commissioner, as will be noted in his testimony, says that the motion picture is simply a substitute for the addresses and speeches which the members have themselves made to the public at various times upon transit conditions. No doubt this is so, but we have not heard of the Commissioners charging the city for these addresses, nor do we understand that they believe it would be a proper charge to pay lecturers and speakers to go about through the city proclaiming the work of the Commission and the evils which they were undertaking

to abolish. There is no objection to the motion picture and the information which it very interestingly imparts. The objection is to the cost of the production and exhibition as being something beyond that contemplated by the Legislature in passing this Rapid Transit Act.

And right here let me note a distinction which apparently has been overlooked. The question is not whether the exhibition of a motion picture portraying the development of transit in the city of New York is a city purpose within section 10 of article 8 of our Constitution (*Schieffelin* v. *Hylan*, 236 N. Y. 254); it is whether the act referred to creating and defining the powers of the Transit Commission gives to *them* the right to do this thing.

And now for the act. What does it authorize, and has it any limitations? Section 4-a of the act provides: " There shall be a transit commission for cities    *    *    * which shall possess the powers and duties hereinafter specified, and also all powers necessary or proper to enable it to carry out the purposes of this chapter."

The duties, therefore, are specified in the act, and the powers include all those things necessary to enable it to carry out the specified duties. Section 8 gives to each Commission the power " to make such contracts for special services as it may deem to be necessary to carry out the provisions of this chapter, or to perform the duties and exercise the powers conferred by law upon the commission."

· The making of contracts is also limited to the duties prescribed by the act and the things necessary to carry out those duties and purposes.

In *Matter of McAneny* v. *Bd. of Estimate, etc., N. Y.* (232 N. Y. 377, 387) we said regarding this law:

" The act, in addition to amending the Public Service Commissions Law in certain respects, and in addition to vesting in the transit commission certain regulatory functions, and all the powers and duties under the Rapid

Transit Act of 1891, as amended, vests in the transit commission, by article 6, and as a grant of a distinct and independent power, the right and duty to prepare a plan of readjustment for the relief of the emergency which is declared to exist."

Upon a re-examination of this law and of article 6, under which the Commission has attempted to act, we again conclude that the duty placed upon the Commission was the preparation of a *plan* for the relief of the transit situation regarding which an emergency was declared to exist. All powers necessary to carry out this purpose were vested in the Commission. Whatever was necessary to devise, or to imagine, or to procure a plan which would relieve the transit situation, the Commission could do. Section 106 has this caption: " Commission to prepare plan of readjustment." The section reads.

" The commission after making the necessary studies and investigation shall prepare a plan of readjustment for the relief of the emergency which is thereby declared to exist, and for the improvement of transit in such city. Such plan shall contain provisions, which in the judgment of the commission, will accomplish as nearly as may be the following four main purposes: (1) the combination, rehabilitation, improvement and extension of existing railroads so that service thereon may be increased and improved to the fullest extent possible, (2) the receipt by the city of sufficient returns from the operation of the railroads so that the corporate stock or bonds issued by the city for the construction of rapid transit railroads may be exempted in computing the debt incurring power of the city under the constitution of the state, (3) the readjustment of the existing rights and obligations of the railroad companies so that the real values in the railroads may be protected and securities stabilized and (4) the assuring to the people of the city the continued operation of the railroads at the present

or lowest possible fares consistent with the just valuations of the railroads and their safe and economical operation. The commission shall also endeavor to include in the plan of readjustment appropriate provision for the protection of tort creditors. Without limiting the authority and discretion of the commission, it shall consider the incorporation in the plan of provisions whereby the title to such railroads as are not already owned by the city and whose ownership thereby is deemed by the commission to be desirable may be vested in the city in return for a lease of such railroads by the city, and in the event of the incorporation of such provision in the plan the commission shall outline an arrangement whereby outstanding securities of the railroad companies may be exchanged for new securities and the valuation of the railroads, determined as hereinafter provided, amortized."

The Commission is also authorized to make a valuation of property " in connection with the preparation of such plan." The Commission shall also give consideration to the connection with railroads and lines without the city " in connection with the preparation of the plan of readjustment." Further, the Commission shall consider incorporating into contracts a provision for a board of control, but this likewise shall be " in the preparation of the plan of readjustment."

Section 106 deals solely with the preparation of a plan for the readjustment of the railroad systems and operation of transit lines in New York city. Section 107 deals with the procedure under the plan of readjustment. It supposes the completion of the plan. So far as section 106 goes, public opinion has nothing to do with its provisions. The plan is to be made and adopted by the Commission after proper investigation and study of the situation. Having adopted the plan then before the contracts are made, the Commission must do something else. Section 107 specifies what this is. It shall hold a public hearing as provided in the case of contracts by section 37 of the

Rapid Transit Act. It shall transmit a copy of the plan to the local authority of the city and to each of the railroad companies with a request for a statement of the views of such local authority and such railroad companies. Thereafter the Commission may modify the plan. Then it shall formally adopt the plan which it deems sufficient and call upon the railroad companies to inform it whether they elect to accept the plan and be included in the arrangements. Before finally fixing the terms and conditions of any contract required to carry out the plan, the Commission shall hold public hearings in accordance with the provisions of section 37 of the Rapid Transit Act. Upon the adoption of the contract it shall be transmitted to the local authority which may request a further public hearing. If the public authority refuses or neglects to approve the contract, the Commission may execute it in the name of the city.

In brief, this is an outline of the additional powers and jurisdiction of the Transit Commission under article 6 of this law of 1921. The whole aim and purpose of the article is to obtain *a plan* which will work and remove the emergency in the transit tangle which is declared to exist. The approval of the public is not mentioned in the article. The approval of the city and the approval of the railroads must be requested and the plan must be submitted to them. The public is afforded a hearing. In fact, three public hearings may be had. The question naturally arises, what is the good of a public hearing if the public knows nothing about the plans proposed. The hearings are not for the purpose of informing the public, but for the purpose of giving suggestions to the Commission or else as affording an opportunity for objection. How then, is the public to know about the plans? The law provides for this in the same way as it provides for a hearing upon all other contracts or plans proposed by the Transit Commission. Section 37 of the Rapid Transit Act is to provide the machinery. Chapter 625 of the

Laws of 1917 amends chapter 4 of the Laws of 1891 entitled: "An act to provide for rapid transit railways in cities of over one million inhabitants." Subdivision 2 of section 37 of such chapter, is amended to read:

" Before finally fixing the terms and conditions of any contract for any of the purposes contained and set forth in this act except where there is an extraordinary emergency involving danger to life or property or where the estimated expense of a contract does not exceed twenty-five thousand dollars, the public service commission shall set a date or dates for a public hearing upon the proposed terms and conditions thereof, at which citizens shall be entitled to appear and be heard. No such hearing shall be held, however, until notice thereof shall have been published for at least two weeks immediately prior thereto in the *City Record,* or other official publication of the city, and at least twice in two daily newspapers published in the city. It shall be the duty of the commission to cause as many copies of a draft of the proposed contract to be printed at least two weeks in advance of such hearing as may be necessary. The said notice of such public hearing shall state where copies of such drafts may be obtained upon payment of a fee, to be fixed by said commission, but not to exceed one dollar for each such copy. The commission may, after the hearing to be held as above required, alter, modify or amend such draft contract in any manner in its discretion."

However desirable it may be in our estimation or in the estimation of the Commission for its plan when adopted to be brought home and explained to the public generally, the fact is that the law places a limitation upon this dissemination of knowledge; rather it places a limitation upon the cost of such work. Copies of the drafts of the contracts can be obtained, as many of them as desired; and they may be distributed throughout the city by the Rapid Transit Commission. Anybody interested can obtain one, so far as the powers of the Commission are

concerned. However, a fee must be charged for each copy. Is it reasonable to suppose that the Legislature thus guarding the expense of publication, left it open for the Commission to furnish information on the movie screen and charge the expense to the public in general?

The Transit Commission is given power by section 8 of this law to employ engineers, railroad experts and other persons of skill and ability necessary to solve this one municipal problem. Having solved the problem by the adoption of a plan, the Commission has the further power to adopt it, after submitting it to the railroads, to the city, and after affording a public hearing. Nowhere in this act do we find any intention that the carefully prepared plan of men skilled in this work must meet the public approval before it be adopted. In giving such broad powers to a Transit Commission, the public trusts to and relies upon the skill, ability and integrity of these public officials and their band of trained experts to furnish the best transit facilities at the least cost and expense which the mind and experience of man can devise. The public does not expect, knowing its own limitations, to be called upon to approve the details of such work. The law does not provide for such approval.

We, therefore, can find no justification for this expense incurred by the Transit Commission. It was not called upon to educate the public in transit matters. It was no part of its duty to advise the public as to its plan and purposes other than in the method provided by this law. Its work was to devise the plan. If this were good, the public would soon know it through other channels.

We have no desire, nor is it our intention, to place a strict construction upon this law, or the powers of the Transit Commission. In fact we are desirous of giving to the act as broad and as liberal an interpretation as necessity requires. Yet reason dictates that there must be limitations upon the powers which the Transit Commission have here undertaken. If they are to acquaint the

public with their work. and their schemes, carrying information to all the homes regarding the transit conditions as they heretofore have existed and now exist, what means would not be available for this purpose? The hiring of halls, of lecturers for public meetings, the posting of bills, or the use of the radio, or any of the other devices whereby men now advertise themselves or their goods could be used for this purpose, and the cost of it all charged up to the city as a proper expense. The line must be drawn somewhere, and we draw it as here indicated, feeling that the law creating the Commission has limited as well as given power. What we have here said has no application to the reports referred to by the Commissioner in his testimony.

For the reasons here expressed, the order of the Appellate Division should be reversed and that of the Special Term affirmed, with costs in this court and the Appellate Division.

CARDOZO, ANDREWS and LEHMAN, JJ., concur; HISCOCK, Ch. J., and McLAUGHLIN, J., dissent; POUND, J., absent.

Order reversed, etc.