In the Matter of the BRONX CHAMBER OF COMMERCE, INCORPORATED, Petitioner, for an Order against WILLIAM G. FULLEN and Others, Constituting the Transit Commission of the City of New York, Metropolitan Division of the Department of Public Service, and THE CITY OF NEW YORK, Respondents.

Supreme Court, Special Term, New York County, May 24, 1940.

*Kadel, Sheils & Weiss* [*John Kadel, Selig J. Silverman, Charles V. Halley* and *I. Charles Schwalb* of counsel], for the petitioner.

*George H. Stover*, for the respondents William G. Fullen and others.

*William C. Chanler, Corporation Counsel* [*William S. Gaud, Jr.*, and *Leo Brown* of counsel], for the respondent City of New York.

*Louis Marder*, for Bertha Marder, *amica curiæ*.

HAMMER, J. This proceeding in the nature of certiorari is brought under article 78 of the Civil Practice Act to review two orders of the Transit Commission made February 21, 1940. The

Transit Commission has thereby granted its approval of the proposed condemnation and demolition of the Ninth Avenue elevated properties from One Hundred and Fifty-fifth street to South Ferry, and the Second Avenue elevated properties from Sixtieth street in the borough of Manhattan, north to One Hundred and Twenty-ninth street. The Commission was acting in part of the proceedings designed to effect the acquisition and unification of railroad transit lines in the city of New York.

The State Legislature in May, 1939, enacted two amendments to the Administrative Code of the City of New York (Laws of 1939, chaps. 475, 476), one applying to the Ninth Avenue elevated and the other to the Second Avenue elevated. Differing only in the descriptions of the properties, the statutes provided as follows:

" Sec. 141–6.1. * * * a. The board of estimate, with the approval of the Transit Commission, is authorized to acquire by condemnation in one or more proceedings as an assessable improvement or improvements pursuant to the charter and code the right to remove all or any part of the elevated railroad structures existing on or along the following route or routes in the boroughs of Manhattan and the Bronx: [Here follows the description of the properties and other matter not relevant for present purposes.]

" f. Neither the city nor any agency thereof shall operate any cars or trains upon or over the elevated railroad structures which the city shall acquire the right to remove under this section, or authorize any person or corporation to do so; except in connection with the removal thereof."

In August, 1939, the board of estimate, acting pursuant to this statutory authorization, by resolution, requested approval of the condemnation of the properties described in the two amendments to the Administrative Code. The Transit Commission thereupon on September 19, 1939, ordered hearings which were held on October 26, 27, November 9, 14, 21, 29 and on December 7 and 12, 1939. The petitioner, a number of individuals and civic organizations appeared and voiced opposition to the city's application. Expert and other testimony was offered in opposition. During the course of the hearings, the board of estimate amended its resolution with respect to the Ninth Avenue elevated, by omitting that portion of the line which runs from One Hundred and Fifty-fifth street over the Harlem river into the Bronx and connecting with the Jerome Avenue subway.

On February 21, 1940, the Transit Commission, Commissioner Haskell dissenting, granted approval of the city's application with respect to the Ninth Avenue elevated, as requested in the city's amended resolution; and granted approval with respect to that

portion of the Second Avenue elevated which runs from Sixtieth street north to One Hundred and Twenty-ninth street in the borough of Manhattan. The Commission expressly refused its approval of the application with respect to that portion of the Second Avenue elevated running from Queensboro Plaza to Sixtieth street in the borough of Manhattan, and then south to Chatham Square.

The petitioner thereupon made application for a rehearing before the Commission, which was formally denied by order dated March 7, 1940. Feeling aggrieved, petitioner instituted this proceeding. Petitioner's contention is that the orders of the Transit Commission approving the condemnation are " arbitrary, capricious, erroneous, illegal and void." The basis for the relief demanded, in substance, is the contention that there are no adequate substitute facilities for the persons presently using the Second Avenue and Ninth Avenue elevated lines, particularly for many thousands of New Yorkers residing in the West Bronx, for whom the Ninth Avenue is the only means of transportation, and in the East Bronx, who now use the Second Avenue elevated. It is contended further that the long-existing Third Avenue elevated is not an adequate substitute for the Second Avenue-Bronx traffic, and the substitution of a transfer juncture at Eighth avenue and One Hundred and Fifty-fifth street is not only no relief but is in reality a discrimination against the West Bronx residents. Petitioner claims the Third Avenue and Eighth Avenue lines now carry peak loads and the thousands of Bronx travelers will be forced into existing overcrowded conditions which are immoral, dangerous to person and property, and the result will aggravate the recognized existing conditions of social disturbance and distress.

Upon the return of petitioner's order to show cause, the respondents Transit Commission and the City of New York on written notice applied for an order dismissing the petition as matter of law upon the following grounds: (1) That the court has not jurisdiction of the subject of the action; (2) that the petitioner has no legal capacity to sue; and (3) that the approval orders of the Transit Commission do not finally determine the rights of the parties with respect to the matter to be reviewed.

The city moved on the additional grounds as follows: (a) That the petition does not state facts sufficient to constitute a cause of action; and (b) that the petition fails either to state a cause of action or to demand relief against the respondent, the City of New York.

The association of owners — Second, Ninth Avenues, Inc.— as an interested party, filed objections to the petition. Bertha Marder, an owner of property in the area affected by the proceeding, filed a brief as *amica curiæ*.

Petitioner's position upon respondents' motion to dismiss, as stated by it, is " that no question of sufficiency of evidence is presently being raised. The argument is directed solely to the question of jurisdiction to review, and not the degree of proof necessary to sustain or upset the Commission's determination. The argument that this court lacks jurisdiction to review rests upon a basic misconception of the status of the respondent, the City of New York, in this proceeding. With the consummation of transit unification, the city becomes the carrier and acquires the responsibility of every common carrier to operate and maintain sufficient transit facilities to accommodate the public convenience and necessity. This truism would need no repetition if a private carrier sought permission to abandon a line because, let us say, the particular operation proved unprofitable. Its special obligations as a common carrier could not be extinguished by its unilateral action; it would be compelled to justify its proposed action before the proper regulatory body where the public interest could be weighed and protected. The necessity of determining the effect of abandonment on the riding public is not obviated by the fact that the municipality itself is the carrier. *Qua* carrier, its obligations to the public are the same as those of a private company."

The issue thus presented is solely one of law. While for the purpose of this motion petitioner's allegations may be regarded as facts, the real issue is whether the orders sought to be reviewed are reviewable by this court. It is, therefore, important to have in mind certain constitutional and statutory enactments, legislative declarations and reported decisions which unfold graphically the permanent condition of insufficient service and distress by reason of which the Legislature declared an emergency existed requiring building, acquisition and unification of railroad transit lines in the city of New York. The question has engaged the attention of the authorities, the public and civic organizations for many years.

In 1921 the Legislature declared that an emergency existed in the transit situation in the city of New York (Laws of 1921, chap. 134). (*Huff* v. *City of New York*, [1922] 202 App. Div. 425.) Investigations and studies to relieve the situation were constantly held thereafter. It is unnecessary further to refer to the conditions existing. Decided cases fully state the historical facts. (*Matter of Gilchrist*, [1927] 130 Misc. 456.) The difficulties and problems became so grave that the Transit Commission felt impelled to instruct the public of the situation but found that it was not empowered to expend its funds or incur indebtedness for the proposed purpose. The deplorable transit conditions nevertheless were fully recorded in the court's decision. (*Matter of Continental Guaranty*

*Corp.* v. *Craig,* [1925] 240 N. Y. 354, revg. 212 App. Div. 236.) The emergency was defined as " a permanent condition of insufficiency of service or of facilities, resulting in social disturbance or distress." (*Huff* v. *City of New York, supra.*) The matter was before the Constitutional Convention of 1938. A proposed amendment was adopted in respect of the debt-incurring power of the city to authorize the contracting of indebtedness not exceeding $315,000,000 to acquire railroads, facilities, properties or rights and to deliver the city's obligations evidencing such indebtedness to the corporation owners. This amendment on referendum was adopted by vote of the People November 8, 1938, and became section 7-a of article 8 of the State Constitution. It provided that the Legislature shall prescribe the method by which and the terms and conditions under which the amount of indebtedness shall be determined and excluded from that which the city could otherwise incur under the Constitution. In 1939 the Legislature enacted chapter 474 of the Laws of 1939 amending the city charter by adding section 273-a and amending section 275 and created the " Transit Unification Sinking Fund of the City of N. Y.," and provided the investment of the fund moneys in obligations for transit unification.

It is noted that the Transit Commission was not required by the provisions of chapters 475 and 476 of the Laws of 1939, to which reference is made, to hold hearings. If the Commission was a legislative agency exercising the function of eminent domain, it was not required to obtain through hearings the information upon which decision and action were based. Nevertheless, hearings were held and the information obtained was deemed sufficient for the decision reached and the action taken.

The basic difference between petitioner and respondents is that the petitioner regards the city merely as a common carrier, now and in prospect, and the Transit Commission as a regulatory body whose hearings and decisions were an exercise of police power, whereas the respondents are convinced the power exercised is that of eminent domain.

Eminent domain is one of the sovereign powers inherent in the State as sovereign to take private property for public use. It is a reserved right or inextinguishable attribute of sovereignty exercisable by the State, or its authorized agent to effect a public good whenever public necessity requires. The only limitation upon the exercise of the power is that the use must be public, compensation must be made, and due process of law observed. (*Secombe* v. *R. R. Co.,* 90 U. S. 108; *Matter of Fowler,* 53 N. Y. 60, 62.) The State Constitution does not create the power but recognizes its existence and merely regulates its use by designating limitations

within which it may and beyond which it cannot be used. The power is exerted through the legislative branch which alone, within those constitutional limitations and completely independent of the other branches, may proceed to determine the necessity and prescribe the method and extent of the taking. (*Garrison* v. *City of New York*, 88 U. S. 196.) All private property, tangible and intangible, may be taken, including that already devoted to a public use which, although favored and to some extent protected, may also be condemned and taken. (*People* v. *Kerr*, 27 N. Y. 188; *Matter of City of Buffalo*, 68 id. 167.) The State may delegate its power of eminent domain to a subject for a temporary public use of some property within its jurisdiction but never permanently parts with it. Subject to constitutional limitations, public use, due process, and the obligation of compensation, the State may take or resume property at will. (*People* v. *Adirondack R. Co.*, 160 N. Y. 225, 238; affd., 176 U. S. 335.) As the legislative branch alone may determine the necessity and prescribe the method and extent of the taking, it may also delegate the duty of determining necessity or expediency in the acquisition of private property to a tribunal of its creation or choice and the opinion arrived at and decision made are political and judicial. (*Matter of City of New York* [*Ely Ave.*], 217 N. Y. 45, 57.) Whether the use for which the property is authorized to be taken is a public use is a judicial question, but the question of the necessity of the taking for public use is exclusively a legislative one and the Legislature has the right to designate officers, bodies or tribunals to determine exigency or necessity. The decision of the Legislature or of its instrumentality is conclusive. (*Matter of City of Rochester* v. *Holden*, 224 N. Y. 386, 391; *People ex rel. Horton* v. *Prendergast*, 248 id. 215; *Matter of Niagara, L. & O. P. Co.*, 125 Misc. 269.)

The objection that the appropriation of property is not for a public use may be raised not alone by the owner but by any person interested, even as a taxpayer (*Long Island R. R. Co.* v. *Jones*, 151 App. Div. 407; *Stratford* v. *City of Greensboro*, 124 N. C. 127), unless waived (*Matter of Cooper*, 93 N. Y. 507, affg. 28 Hun, 515; *Embury* v. *Conner*, 3 N. Y. 511, revg. 4 N. Y. Super. Ct. 98; *Baker* v. *Braman*, 6 Hill, 47). The declaration of public use by the Legislature will be accepted by the courts unless it is shown that the use is clearly private. The determination by a municipality or public agency that the use for which it is appropriating property is public, while subject to review, is not given as close scrutiny as when the power is exercised by a private corporation. A use is considered public when it affects the public generally, or any number thereof as such and not as individuals, or is for public benefit, utility or

advantage or to develop the natural resources of a locality in view of the general welfare. (*Matter of Long Sault Dev. Co.* v. *Kennedy*, 158 App. Div. 398; affd., 212 N. Y. 1; *Matter of Mayor of New York*, 135 id. 253; *Matter of Niagara Falls & W. R. Co.*, 108 id. 375.)

There is analogy and also sharp distinction between the powers of eminent domain and of regulation under the police power. The latter is distinguished from the former in that in its exercise police power is exerted to regulate the use and enjoyment of property by the owner or to take away or to destroy property to promote the general welfare or to conserve the safety, health or morals of the public, and the owner is not entitled to any compensation for injury sustained in consequence. The taking under police power is under the maxim *sic utere tuo ut alienum non lædas*, and the loss is *damnum absque injuria*, while in eminent domain the taking is of private property for public use entitling the owner to just compensation. (*Matter of Cheesebrough*, 78 N. Y. 232; *People ex rel. Goff* v. *Kirk*, 136 App. Div. 45; *Health Dept. of City of N. Y.* v. *Rector of Trinity Church*, 17 N. Y. Supp. 510; revd. on other grounds, 145 N. Y 32; *Chicago, B. & Q. R. Co.* v. *Illinois*, 200 U. S. 561.)

Police power is the general inherent power vested in each State to prescribe such reasonable rules for the conduct of its citizens and residents, and regulations for the use of private property, as are necessary for the welfare of the public and not in conflict with rights · secured by the State and United States Constitutions.

The doctrine of police power as originally announced by the United States Supreme Court is the right of the State Legislature to take such action as it saw fit, in the furtherance of the security, morality and general welfare of the community.

" But what are the police powers of a State?" asked TANEY, Ch. J. (*License Cases*, 5 How. 504, at p. 583, cited in *Passenger Cases*, 7 id. 283, at p. 470). " They," he answered, " are nothing more or less than the powers of government inherent in every sovereignty to the extent of its dominions. And whether a State passes a quarantine law, or a law to punish offences, or to establish courts of justice, or requiring certain instruments to be recorded, or to regulate commerce within its own limits, in every case it exercises the same power; that is to say, the power of sovereignty, the power to govern men and things within the limits of its dominion. It is by virtue of this power that it legislates; and its authority to make regulations of commerce is as absolute as its power to pass health laws, except in so far as it has been restricted by the Constitution of the United States."

In any fair and just construction of the constitutional and statutory enactments in question, it is necessary to look at the evil which

they were designed to remedy, the purpose which motivated their enactment, and the process which seemingly was intended to be provided to cure that evil and accomplish that purpose. Railroads cannot be built, acquired and unified into one system as a public agency under police power. The function is obviously that of eminent domain and the action taken political. In any event the authority of law under consideration is that of legislative enactment. It may be that the Legislature could have authorized acquisition of the railroad line in question by voluntary purchase or by condemnation and required the new operator to apply under the Public Service Law for permission to discontinue service and demolish the lines and structures. (Public Service Law, art. 7.) In its wisdom the Legislature enacted otherwise. The legislation adopted authorized the procedure here followed by the public authorities. That procedure appears to be solely and strictly under the power of eminent domain through the process of condemnation under chapters 475 and 476 of the Laws of 1939. The emergency, being a permanent condition of insufficiency of service or facilities resulting in social disturbance or distress, may well be regarded as requiring more and better railroad transportation lines and facilities of transit. Undoubtedly this is the ultimate object sought to be accomplished by the public authorities. The futility of any such accomplishment by the proposal to destroy present lines before other adequate substitutes are provided or even planned and thus aggravating the emergency by adding to the existing disturbance and distress and thus discriminating against innumerable New Yorkers resident in the Bronx, is the fundamental grievance of petitioner because of which the method pursued is assailed by application to the court. Treat any number unfairly or discriminate against any section and the whole people and community will suffer. It is obvious, however, that the power exercised is that of eminent domain and not that of regulation through the exercise of police power and that the Legislature and its authorized agency is entitled to act free of any action or interference by the courts. As the action taken is political, petitioner and the innumerable aggrieved persons and taxpayers in whose behalf it asserts this proceeding is brought may have resort only to political action. They may exert persuasion and pressure through petition, assembly, speech, press and ballot. The five-cent fare may be in jeopardy, but that is not a matter which can be considered in this proceeding.

In my opinion, this court in the proceeding instituted has no jurisdiction to determine the questions of necessity and expediency. No issue is presented here of public use, and although it may seem futile to raise that question, petitioner or any aggrieved party, if

so advised, may present that issue in other future appropriate proceedings. I am in accord with the views expressed by VALENTE, J., in *Matter of Manhattan Railway Co.* (N. Y. L. J., Jan. 25, 1939, p. 380). The capacity of petitioner to sue is not free from doubt. It has capacity to sue and be sued, but is not shown to be a taxpayer although undoubtedly it represents not only taxpayers but passengers of the railroads in question and residents of the community affected. Article 78 itself is silent on the question of who may institute a proceeding. We may look to other cases in which review was sought of the action of the regulatory body, to assist us in this determination. In *People ex rel. Loughran* v. *Railroad Commissioners* (158 N. Y. 421) the court permitted proceedings to review an application for abandonment to be instituted by residents and commuters. That issue need not be considered further here, as, in view of the conclusions stated, it is unnecessary to decide either that or the other points presented.

The petition to review the order of the Transit Commission is denied and the counter-motions to dismiss the petition on the ground of lack of jurisdiction are granted.

Settle order.