In the Matter of the Application of JOHN F. GILCHRIST and Others, Constituting the Transit Commission of the State of New York, for a Warrant Committing GERHARD M. DAHL to Jail under the Provisions of Section 19 of the Public Service Commission Law.

Supreme Court, New York County, September 15, 1927.

**Witnesses — contempt — proceedings under Public Service Commission Law, § 19, to punish witness for refusal to answer — investigation by Transit Commission preliminary to preparation of plan of readjustment of transit facilities in New York city — investigation involves Brooklyn-Manhattan Rapid Transit Company and Interborough Rapid Transit Company — witness is chairman of Brooklyn-Manhattan Rapid Transit Company — advice of counsel is not good defense for refusal to answer — Commission had power under Public Service Commission Law, § 5-a, and §§ 106-108, to conduct investigation — witness did not have right to refuse to answer on ground that investigation related to his personal affairs — witness not required to answer when he bought and how much he paid for stock — burden of proof is on Commission to show materiality — material and immaterial questions stated.**

The Transit Commission of the State of New York instituted an investigation of the transit situation in New York city for the purpose of preparing a plan of readjustment of transit facilities in New York city. This is a proceeding instituted under section 19 of the Public Service Commission Law to punish a

witness called in that investigation for failure to answer questions. The investigation necessarily involves the Brooklyn-Manhattan Rapid Transit Company and the Interborough Rapid Transit Company. The witness sought to be punished is the chairman of the board of directors of the Brooklyn-Manhattan Rapid Transit Company.

The refusal of the witness to answer on the advice of counsel is not a defense to this proceeding to punish him for contempt if the questions asked are legal, constitutional and material.

The Transit Commission has the power under section 5-a and sections 106–108 of article 6 of the Public Service Commission Law to conduct the investigation which it is conducting and to call witnesses in that investigation, and, therefore, the refusal of a witness to answer on the ground that the Transit Commission does not have jurisdiction, is not a defense.

Furthermore, the witness could not refuse to answer legal questions on the ground that it would disclose his personal affairs and deprive him of his liberty and property without due process of law.

The questions put to the witness generally related to transactions in stock of the Brooklyn-Manhattan Rapid Transit Company and the Interborough Rapid Transit Company. The witness, while required to answer as to ownership of the stock, is not required to answer as to when he bought the stock and how much he paid therefor. That question is immaterial to the inquiry. The only question that is material in reference to the stock is that of ownership.

The burden of proof in this proceeding is on the Transit Commission to show that the questions asked were material to the investigation.

The witness cannot be compelled to disclose whether money was borrowed by the Brooklyn-Manhattan Rapid Transit Company to purchase stock of the Interborough Rapid Transit Company. The witness will be required to answer, however, questions asked relating to the amount of stock of the Interborough Rapid Transit Company owned by the Brooklyn-Manhattan Rapid Transit Company at the time of the hearing and for a reasonable period prior thereto, for the Transit Commission is entitled to know who are the stockholders of the Interborough Rapid Transit Company and the amount of their holdings.

The witness will not be required to answer the question whether or not he dealt in the stocks of the two companies in or out of the market during the six months prior to the hearing.

The question whether or not the witness was selling Interborough Rapid Transit Company stock for the Brooklyn-Manhattan Rapid Transit Company within ninety days prior to the hearing is material and the witness must answer that question.

PROCEEDING under section 19 of the Public Service Commission Law for warrant committing witness to jail for failure to answer questions.

*Clarence M. Lewis* [*Samuel Untermyer, Irwin Untermyer* and *I. Maurice Wormser* of counsel], for the Transit Commission.

*Rushmore, Bisbee & Stern* [*Nathan L. Miller, Henry Root Stern, H. G Pickering, Bertram F. Shipman* of counsel], for the witness Gerhard M. Dahl.

*William D. Guthrie* and *Samuel Seabury, amici curiæ,* for other witnesses.

FRANKENTHALER, J. This proceeding under the Public Service Commission Law (hereinafter referred to as the P. S. C. Law), section 19, paragraph 3 (as amd. by Laws of 1921, chap. 134), was begun by an order to show cause issued upon the affidavit of the chairman of the Transit Commission of the State of New York, setting forth that Gerhard M. Dahl, a witness in a pending proceeding before the Commission, had refused, without reasonable or proper cause, to answer legal, pertinent and material questions when summoned to testify before the Commission, although directed to do so. The motion is predicated also upon the entire proceedings, minutes and exhibits before the Commission in the so-called transit investigation of 1927.

The Transit Commission was directed in 1921 by the Legislature of the State of New York to prepare a plan of readjustment for the relief of the emergency conditions which were declared by the statute enacted in that year to exist in the city of New York, and for the improvement of local transit after making the necessary studies and investigation of the situation. (Laws of 1921, chap. 134, § 105, in effect March 30, 1921; Laws of 1921, chap. 335, in effect April 27, 1921; Laws of 1922, chap. 153, in effect March 22, 1922.)

Before reviewing the essential elements of this legislation, a brief outline of the message of the then Governor to the Legislature of the State, dated January 24, 1921 (N. Y. Leg. Docs., 144th Sess., 1921, vol. 5, No. 31), may be helpful. This message relates solely to the " regulation of public utilities," and invited the Legislature's prompt consideration of needed changes in the law. After setting forth that " the most urgent condition " was presented by the local transit situation, a brief outline of the legislative acts governing the subject of rapid transit lines was presented. It was indicated that the transportation problem " has steadily drifted toward disaster " (Message, p. 5), that many systems have been disintegrated and that the welfare of the entire State " is involved in the right solution of the problem."

The Governor pointed out that the problem was complicated by " a background of crooked financing " (p. 6), and stated that " the time has come to protect it from the sinister designs of selfish financiers," and that it would not be difficult to eliminate their " baneful influence." (P. 6.)

The message went on to state that it was imperative to confer power upon some agency which would lay " solid foundations for a forward looking constructive policy," and declared that " some agency, having public confidence, impartially to ascertain the facts and courageously to apply the remedy, appears to be imperatively demanded to extricate the problem from its present difficulties."

It was further set forth that a unified system under municipal ownership might prove desirable and that it was necessary, in order to accomplish results, to vest in men of character and ability " *all the authority that can constitutionally be given.*" (P. 8.) The Governor went on to say that " a public service commission with all the power under the Rapid Transit Act, and all the power necessary to deal with the problem, * * * appears to me to be the manifest solution." (P. 9.)

In this connection the Governor further said: " The vital thing to do at the moment is to create the agency to deal with the problem with ample and undivided authority and responsibility." The vesting of substantial powers in this Commission was emphasized, it being indicated that " apart from the fact that the police power of the State is involved, quasi-judicial powers should be vested in an impartial tribunal " (p. 10), and stress was laid upon the authority, powers and importance of the Commission to be created by the Legislature under these proposals.

The Legislature acted upon these suggestions, and the laws above referred to were enacted, including article VI of the P. S. C. Law (Laws of 1921, chap. 134, in effect March 30, 1921, as amd. by Laws of 1922, chap. 153, in effect March 22, 1922).

Under article VI of the P. S. C. Law (added by Laws of 1921, chap. 134, as amd. by Laws of 1922, chap. 153), below the heading " Additional Powers and Jurisdiction of Transit Commission," appear a number of sections of importance in the present controversy, including section 106, which is headed " Commission to Prepare Plan of Readjustment; " section 107, which is headed " Procedure Under Plan of Readjustment; " and section 108, which is headed "Additional Powers and Duties of Commission."

Before proceeding to analyze these sections it is necessary to consider section 5-a of the P. S. C. Law (as amd. by Laws of 1921, chap. 335), entitled "Jurisdiction of Transit Commission." It is provided in this section that " the *jurisdiction, supervision, powers and duties* of the transit commission shall extend under this chapter " to various subject-matters, including "*4. To matters or subjects jurisdiction whereof is conferred on such commission by article six of this chapter.*"

As already stated, article VI, which is headed "Additional Powers and Jurisdiction of Transit Commission," contains among other provisions, sections 106 and 108 of the P. S. C. Law, under and pursuant to which the transit readjustment plan suggested by the then Governor was to be formulated.

It will be noted that the Legislature adopted the Governor's suggestion as to conferring the necessary " jurisdiction, powers and

duties," by providing that the jurisdiction of the Commission with all its powers and duties should extend to the matters and subjects concerning which the Legislature conferred jurisdiction on the Commission by article VI, which went into effect at practically the same time as section 5-a. Manifestly, therefore, article VI, including sections 106 and 108, must be read in the light of and construed together with the jurisdiction, powers and duties conferred upon the Commission in so many words under section 5-a.

When article VI is considered it becomes apparent that the Legislature, adopting the Governor's suggestions, intended to and did confer upon the Transit Commission broad powers and jurisdiction in order that it might formulate a plan of readjustment for the relief of the serious conditions — described, indeed, as " an emergency."

Section 106, under article VI, is entitled " Commission to Prepare Plan of Readjustment." It begins with the following words: " The commission, *after* making the necessary studies *and* investigation shall prepare a plan of readjustment for the relief of the emergency which is hereby declared to exist, and for the improvement of transit in such city." (Italics are mine.) The section then provides that the plan should, if possible, accomplish four main purposes stated: " Such plan shall contain provisions, which in the judgment of the commission, will accomplish as nearly as may be the following four main purposes: (1) The combination, rehabilitation, improvement and extension of existing railroads so that service thereon may be increased and improved to the fullest extent possible, (2) the receipt as soon as practicable by the city of sufficient returns from the operation of the railroads so that the corporate stock or bonds issued by the city for the construction of rapid transit railroads may be exempted in computing the debt incurring power of the city under the constitution of the state, and (3) the assuring to the people of the city the continued operation of the railroads at the present or lowest possible fares consistent with the just valuation of the railroads and their safe and economical operation. The commission shall also endeavor to include in the plan of readjustment appropriate provision for the protection of tort creditors."

It was then provided that " without limiting the authority and discretion of the commission " the wisdom of incorporating in the plan certain specific provisions should be considered. The statute provided: " Without limiting the authority and discretion of the commission, it shall consider the incorporation in the plan of provisions whereby the title to such railroads as are not already owned by the city and whose ownership thereby is deemed by the

commission to be desirable may be vested in the city in return for a lease of such railroads by the city, and in the event of the incorporation of such provision in the plan the commission shall outline an arrangement whereby outstanding securities of the railroad companies may be exchanged for new securities and the valuation of the railroads, determined as hereinafter provided, amortized."

It was further provided that in connection with the preparation of the plan "the commission shall cause a valuation to be made of the property," which should take into account not only the suggestions enumerated in the statute, but also must pay "due regard to all other pertinent facts and conditions." Section 108 confers further powers and duties.

Before passing to the present investigation, which was ordered under the mandate of these provisions, it should be noted that the Commission was directed by the Legislature to prepare its plan of readjustment only *after*, under the express terminology of section 106, it had (a) made the necessary studies and (b) made the necessary investigation. Studies alone were not to suffice. Investigation alone was not enough. The Legislature following the suggestions of the Governor, directed in so many words that the readjustment plan for the relief of emergency transit conditions should be prepared only after *both* "necessary studies *and* investigation" should have been made by the Commission.

It is helpful to note, in connection with the correct interpretation of this terminology — if indeed there be any room at all for interpretation — that the rapid transit companies participated in the investigation conducted in the year 1921 by the Transit Commission under and pursuant to the identical article and sections of the P. S. C. Law, and that the companies at no time urged that the Commission was without authority to conduct the investigation or to subpœna witnesses and take testimony in connection therewith. Presumably the meaning, scope, extent and significance of article VI, embracing sections 106 and 108, *inter alia*, were thoroughly understood at that time by all concerned, though now the authority of the Transit Commission to investigate and to subpœna and hear witnesses thereunder is challenged.

Under sections 5-a, 106 and 108 of the P. S. C. Law, the Transit Commission on May 12, 1927, made an order for the comprehensive investigation contemplated by section 106. This order, among other matters, set forth that the object was to advise and inform the Commission in respect to all facts relevant or pertinent to the plan of readjustment, which the Commission is required by the terms of the statute to prepare, and the relations of such proposed plan to each and every railroad, street railroad, omnibus

line, route, person or corporation within the jurisdiction of the Commission.

Hearings were held pursuant to this order beginning with May 23, 1927, and the investigation is still pending and undetermined.

Mr. Dahl was duly subpœnaed by the Transit Commission pursuant to section 19 of the P. S. C. Law, which provides for the attendance of witnesses, and their fees, at any investigation or hearing to be conducted by the Commission. It sets forth in subdivision 1 the essentials of subpœnas for witnesses at an *investigation* or hearing, the fees of witnesses and the manner of service. In subdivision 2 provision is made for the prosecution of a witness for a misdemeanor in any court of competent criminal jurisdiction if a witness, without reasonable cause, in the course of an investigation or hearing shall refuse to be sworn or to be examined or to answer a question or to produce a book or paper when ordered to do so. The last paragraph of said subdivision 2, upon which the present proceeding to punish is predicated, is sufficiently important to warrant its full quotation. The statute reads as follows:

" § 19. 2. * * * If a person in attendance before a commission or a commissioner, or an officer or employee specially authorized to conduct an investigation or hearing, refuses without reasonable cause to be examined or to answer a legal and pertinent question or produce a book or paper, when ordered so to do by a commission or a commissioner, or an officer or employee specially authorized to conduct an investigation or hearing, the commission may apply to any justice of the supreme court upon proof by affidavit of the facts for an order returnable in not less than two nor more than five days directing such person to show cause before the justice who made the order, or any other justice of the supreme court, why he should not be committed to jail; upon the return of such order the justice before whom the matter shall come on for hearing shall examine under oath such person whose testimony may be relevant, and such person shall be given an opportunity to be heard; and if the justice shall determine that the person has refused without reasonable cause or legal excuse to be examined, or to answer a legal and pertinent question, or to produce a book or paper which he was ordered to bring, he may forthwith, by warrant, commit the offender to jail, there to remain until he submits to do the act which he was so required to do or is discharged according to law."

Mr. Dahl appeared as a witness before the Commission on June 8 and 10, 1927, and after being duly sworn proceeded to testify. The record shows that he, as well as various other witnesses, including Mr. Wiggin (an application to punish whom for contempt

has been brought on simultaneously with the present motion), were asked a large number of questions which they, including Mr. Dahl, refused to answer, although directed by the chairman on behalf of the Commission to answer them, and advised by the special counsel to the Commission that the questions were material, pertinent and necessary for the purposes of the investigation.

The witness's refusal to answer the questions is sought to be justified upon four main grounds: (a) The advice of counsel, who are said to have advised the witness that the questions need not be answered; (b) that the questions are not legal because the P. S. C. Law neither expressly nor impliedly gives authority to the Transit Commission to hold an investigation or to subpœna and examine witnesses in connection with the preparation of a plan of readjustment of transit conditions; (c) the questions violate the constitutional rights of the witness by prying into his personal affairs; (d) the questions were not material and pertinent to the subject of a plan of readjustment, and that, therefore, the witness's declinations to answer them were founded in reasonable cause.

Each of these objections will be considered in order.

(a) The advice of counsel is no justification for refusal to answer questions provided the questions are legal, constitutional and material. In *United States* v. *Sinclair* (*infra*) the witness was recently convicted because of his refusal to answer questions concerning what he regarded as a prying into his personal affairs and as neither material nor pertinent to the oil inquiry being conducted by the investigating committee of the Senate of the United States, despite his contention that he had acted on the advice of an eminent member of the local bar. No amount of legal advice, no matter how distinguished, can serve to emasculate the powers of the Transit Commission or of the courts.

(b) The learned counsel for the witness contends that, as a matter of law, there is no power in the Transit Commission to hold an investigation in connection with the preparation of a plan of readjustment or to subpœna and examine witnesses in connection therewith, and that the questions are, therefore, illegal and unauthorized. In this connection counsel states in his able brief (p. 13), " neither section 106 nor any other part of article VI contains any express grant of power or authority to the commission to convene a hearing and subpœna and examine witnesses with respect to such Plan of Readjustment." But this statement overlooks the message to the Legislature, above adverted to, as well as section 5-a of the P. S. C. Law, which provides, under the heading " Jurisdiction of Transit Commission," that the jurisdiction, powers and duties of the Transit Commission shall extend " to matters or

subjects jurisdiction whereof is conferred on such commission by article six of this chapter," as well as sections 106–108 of article VI. It is too late to question the jurisdiction, powers and duties of the Commission as to holding investigations or subpoenaing and examining witnesses. Further, article VI, section 106, provides that the Commission shall make an "investigation" and shall prepare its readjustment plan in the light thereof. The verbiage is as follows: "The commission after making the necessary studies and investigation shall prepare a plan of readjustment for the relief of the emergency which is hereby declared to exist, and for the improvement of transit in such city."

It is clear, from the terminology thus employed by the Legislature in its enactment pursuant to the Governor's message, that the Commission, *firstly*, should study the situation; *secondly*, should investigate it, and then, *thirdly*, should prepare a readjustment plan which should flow out of and be consequential upon the aforesaid necessary studies and investigation. If there be any doubt that doubt must be resolved in favor of the jurisdiction of the Commission in the light of the case of *Matter of Continental G. Corp.* v. *Craig* (240 N. Y. 354), dealing with the construction of the *same* section 106, wherein the Court of Appeals stated (at p. 367): "We have no desire, nor is it our intention, to place a strict construction upon this law, or the powers of the Transit Commission. In fact we are desirous of giving to the act as broad and as liberal an interpretation as necessity requires." (See, also, *Dunham* v. *Ottinger*, 243 N. Y. 423.)

Section 106 employs the term "investigation." This same term is repeatedly used in connection with other sections of the P. S. C. Law, including section 19, which provides for the attendance and testimony of witnesses. And the term has a well-defined meaning, denoting an inquiry by hearing witnesses, taking testimony and receiving full disclosure. (23 Cyc. 349; *People* v. *Sharp*, 107 N. Y. 427, 450, 451; *Mora* v. *Great Western Insurance Co.*, 10 Bosw. 622, 628; *Matter of Falvey*, 7 Wis. 630; *Wright* v. *City of Chicago*, 48 Ill. 285, 290.)

Such "investigations" have been repeatedly held by the Transit Commission. Thus, witnesses were subpoenaed and compelled to answer questions in connection with the Commission's inquiry into omnibus conditions in New York city. (*Matter of McAneny*, 215 App. Div. 797.)

The Legislature undoubtedly intended that the Commission should exercise a wide latitude in connection with its "investigations," for section 20 of the P. S. C. Law, which is entitled "Practice before the Commission; Immunity of Witnesses," states that "in

all *investigations*" the Commission "shall not be bound by the technical rules of evidence." If an "investigation" does not confer the right to subpœna witnesses and compel them to testify it is hard to conceive why the Legislature should have provided that investigations before the Commission shall not be hampered by the common-law "rules of evidence."

A similar view has been taken by the Supreme Court of the United States of the character, powers and duties of the Interstate Commerce Commission. (See *Interstate Commerce Comm.* v. *Baird*, 194 U. S. 25, 44, 47, especially at the latter page, where the Supreme Court said: " To unreasonably hamper the commission by narrowing its field of inquiry beyond the requirements of the due protection of rights of citizens will be to seriously impair its usefulness and prevent a realization of the salutary purposes for which it was established.") (See, also, opinion of HOEHLING, J., writing for the Supreme Court of District of Columbia, in *United States* v. *Sinclair*, 52 Wash. L. R. 451; petition for writ of certiorari denied by the Supreme Court of the United States, January 10, 1927, *sub nom. Sinclair* v. *United States*, 273 U. S. 741.)

Before passing this phase of the subject the use of the identical word "investigation" again and again in sections 19, 20, 45, 48 and 54, leaves no reasonable doubt what the Legislature intended when it employed the same term "investigation" in section 106 of article VI.

It is also contended by the witness that article VI is isolated from the other sections and subdivisions of the P. S. C. Law and must, therefore, be treated in legal effect as a distinct and separate enactment. The difficulty with this contention is that section 5-a of the P. S. C. Law says that the jurisdiction, powers and duties of the Transit Commission shall extend, among other things, "to *matters or subjects, jurisdiction whereof is conferred on such commission by article six of this chapter.*" (P. S. C. Law, § 5-a, subd. 4, added by Laws of 1921, chap. 134, as amd. by Laws of 1921, chap. 335.) The reason for this insertion was undoubtedly to avoid the necessity of repeating the verbiage of the entire Public Service Commission Law for a second time in the course of the enactment of article VI.

Section 108 of article VI confirms this conclusion, headed, as it is, "Additional Powers and Duties of Commission," and embracing within its purview practically every statute and section bearing upon the powers of the Public Service Commission and upon the so-called Rapid Transit Act.

Furthermore, as already noted, during the course of the 1921 investigation by the Commission, which was conducted under the identical sections of the P. S. C. Law, no point was ever sug-

gested that the Commission was without authority to conduct that investigation and to subpœna witnesses and take their testimony in the course of it.  One of the participants in that investigation was the predecessor of the present Brooklyn-Manhattan Rapid Transit Company (hereinafter referred to as the B.-M. T.), namely, the Brooklyn Rapid Transit Company (hereinafter referred to as the B. R. T.).

For the foregoing reasons it follows that the Transit Commission not only has specific power, but is expressly required to conduct an investigation, hold hearings, subpœna and examine witnesses, and to take and study their testimony and the incidental exhibits for the purpose in connection with the studies of the Commission of preparing an appropriate plan of readjustment for the relief of the emergency transit conditions declared by the Legislature in so many words to be existent in New York city.

(c) The eminent counsel who appeared as *amici curiæ* by leave of the court, on behalf of other witnesses who have refused on their advice to answer similar questions, contend that the witnesses are protected against answering by fundamental constitutional privileges and immunities guaranteed by the State and Federal Constitutions; and, specifically, that answers cannot be compelled without violating the constitutional safeguard against deprivation of liberty without due process of law contained in article I, section 6, of the Constitution of the State of New York and in the Fourteenth Amendment of the Constitution of the United States.  And it is insisted by them that to compel answers to the questions would invade the witnesses' right to liberty which, it is urged, " embraces the right to keep secret one's books and papers, his business methods and his knowledge of his own affairs."  It is also argued that the right of privacy is involved, including " the right to refrain from disclosing one's personal and business affairs " and that this right " is obviously a right of liberty and property." The scholarly briefs in which these contentions are set forth have been of great assistance.

Mr. Dahl himself objected to answering on the ground that he did not wish to disclose his " personal affairs."  There is no rule of law, to quote the Supreme Judicial Court of Massachusetts, " which exempts any person from producing papers, *material* to any inquiry in the course of justice, merely because they are private."  (*Burnham* v. *Morrissey*, 14 Gray [Mass.], 226.)  The true test is, not whether they are private, but whether they are material.

The Supreme Court of the United States has said in *Matter of Chapman* (166 U. S. 661, 669), that a legislative investigation cannot be defeated on the plea, much as here, that questions which

relate to " the private affairs of the witness " need not be answered, where such disclosure is necessary for the discharge of the duties of the congressional investigation. It is well settled, under modern authorities, that the courts nowadays will not take account of sentimental personal considerations as against the public interests or substantial rights. (*Burnham* v. *Morrissey, supra; Matter of Board of Aldermen,* 68 Misc. 478; *Ex parte Parker,* 74 S. C. 466; *Matter of Falvey,* 7 Wis. 630, 639; *Matter of Chapman, supra; McGrain* v. *Daugherty,* 273 U. S. 135; *Dunham* v. *Ottinger,* 243 N. Y. 423.)

In the case of *Interstate Commerce Commission* v. *Brimson* (154 U. S. 447) the Interstate Commerce Commission, acting upon a complaint, instituted an inquiry and called one Brimson as a witness. The court upheld the statute giving the authority to compel the attendance and testimony of witnesses and the investigation, and Mr. Justice HARLAN pointed out (154 U. S. 474) that the power to compel the giving of information was essential to the proper working of the Commission in order that it might perform its duties with regard to the recommendation of congressional legislation. Mr. Justice HARLAN stated as follows: "An adjudication that Congress could not establish an administrative body with authority to investigate the subject of interstate commerce and with power to call witnesses before it, and to require the production of books, documents, and papers relating to that subject, would go far towards defeating the object for which the people of the United States placed commerce among the States under national control. All must recognize the fact that the full information necessary as a basis of intelligent legislation by Congress from time to time upon the subject of interstate commerce cannot be obtained, nor can the rules established for the regulation of such commerce be efficiently enforced, otherwise than through the instrumentality of an administrative body, representing the whole country, always watchful of the general interests, and charged with the duty not only of obtaining the required information, but of compelling by all lawful methods obedience to such rules." (See, also, *Henry* v. *Henkel,* 235 U. S. 219, affg. 207 Fed. 805; *Hall* v. *Geiger-Jones Co.,* 242 U. S. 539; *Hale* v. *Henkel,* 201 id. 43; *Brown* v. *Walker,* 161 id. 591; *Matter of Hertle [In re Ahearn],* 120 App. Div. 717; affd., 190 N. Y. 531; *Matter of Hirshfield* v. *Cook,* 227 id. 297.)

In the case of *Dunham* v. *Ottinger (supra)* a statute far more drastic and inquisitorial than the P. S. C. Law provisions was upheld by the Court of Appeals, Chief Judge HISCOCK writing for the unanimous bench, and it was said: " The power to investigate and examine witnesses to the end of a better discharge of their duties has been conferred upon administrative boards and officials

without successful challenge by so many statutes that it is undesirable to refer to them all."

It is not deemed necessary further to consider the plea of " private affairs," because under the recent authorities above cited it is too late to contend at this point in the development of our constitutional jurisprudence that the power herein contended for on behalf of the Commission is illegal. Nor can a witness nowadays refuse to answer on the plea that the questions concern his so-called " personal affairs " where they also concern the most vital interests of the general public in a matter directly relating to the health, welfare and general well-being of every citizen of the great city of New York under conditions amounting, in the language of the Legislature of the State, to a serious " emergency," provided always that the questions are established to be pertinent and material. When private affairs come into conflict with the public interest the latter, and not the former, must prevail.

The early cases cited by the distinguished counsel for the witness, as for example *Kilbourn* v. *Thompson* (103 U. S. 168), are inapplicable to the present case and were decided at a date long before the courts had taken vigorous and comprehensive strides to combat the frustration of public authorities such as the Interstate Commerce and Transit Commissions in the performance of their vital and important functions.

For these reasons the contention on the part of the witness that the attempted grant and exercise of the subpœna power was in violation of the constitutional right of privacy of the witness and deprived him of his liberty and property without due process of law must be overruled.

(d) The final and most serious point urged on behalf of the witness is that the questions in dispute were not material and pertinent to the subject of a plan of readjustment; and that, therefore, the declinations to answer were founded upon reasonable cause and legal excuse. The Commission, on the other hand, contends that the questions were material, appropriate, legal and pertinent to the investigation, and that the refusal of the witness to answer them, emphasized by the refusal of other witnesses in alleged community of interest with him to answer similar questions, was without reasonable cause or legal justification, and that to deprive the Transit Commission of the benefit of the answers of the witness would tend to foreclose its formulation of an appropriate plan of readjustment of transit conditions pursuant to article VI of the P. S. C. Law.

It is fundamental that the questions must be affirmatively shown to be material and pertinent to the purposes of the pending

investigation. (*People* v. *Foster*, 236 N. Y. 610.) It is not suffi-
cient that the Commission itself or its special counsel deems the
question legal and pertinent. That is a question for the court to
decide as a matter of law.

In *Matter of Barnes* (204 N. Y. 108) the term " legal and pertinent
question " was defined as follows by Judge WERNER (p. 125):
" What is a legal and pertinent question? Obviously one that
violates no legal right of the witness, and that is pertinent — that
is relevant and material — to the purpose of the proceeding or
investigation in which the witness is being examined.  *  *  *
It seems to me that the plain import of the words ' legal ' and
' pertinent ' as used in the statute is to confine the proceeding within
lawful bounds and proper methods with respect to the legal rights
of the individual who is called upon to testify.  *  *  * "

Whether the question is legal and pertinent was stated by Judge
WERNER, at the same page, to be a purely legal question for deter-
mination by the courts. " Who is to decide whether a question is
legal and pertinent? If a legislative committee or its counsel are
to be the final arbiters upon this important limitation, it is an idle
ceremony to appeal to the courts  *  *  *  and when he [the wit-
ness] challenges the legality and pertinency of the information sought
from him, it presents a question of law for the courts to decide."

So far as these rules of law are concerned, opposing counsel are
apparently in accord. Where counsel diverge is in their views of
the materiality and pertinency of the testimony sought to be
elicited by the questions.

The questions which in the course of the investigation the witness
Dahl refused to answer, although directed to answer them, on
behalf of the Commission by its chairman, Mr. Gilchrist, are grouped
in the chairman's affidavit as follows:

(1) Dahl refused to answer questions as to whose bank account
the Waubesa Corporation dividends were paid into (pp. 479, 480):
" Q. And put into her bank account? A. I decline to pursue the
dividends of the Waubesa Corporation to Mrs. Dahl. Q. The
question is whether or not these dividends were paid over to you?
A. I told you they were paid over to Mrs. Dahl. Q. Were they
put into her bank account? A. I decline to answer the question.
Mr. Untermyer: I ask that the witness be instructed to answer the
question. Chairman Gilchrist: You are instructed to answer the
question. The Witness: I decline to answer the question because
I consider it not pertinent or relevant, and that it has nothing to do
with this inquiry (p. 481). Q. Is the money put into your bank
account? A. What money? Q. The dividends? A. I decline to
answer that question. Q. You decline to answer? A. Certainly."

(2) Dahl refused to answer questions as to whether moneys were borrowed to carry stock by the Waubesa Corporation (p. 481): " Q. Are there moneys that are borrowed to carry stock by the Waubesa Corporation?　A. I decline to answer that question.　Q. Or are they borrowed by you?　A. I decline to answer that question."

(3) Dahl refused to answer questions as to whether the Waubesa Corporation has dealt in anything but Stock Exchange securities (p. 482): " Q. Now, has it dealt in anything except Stock Exchange securities, and dealing in the market?　A. Yes.　Q. In what has it dealt besides that?　A. I decline to answer."

(4) Dahl refused and declined to produce the minutes of the Waubesa Corporation (p. 482): " Q. We would also like to have you produce the minutes of the Waubesa Corporation?　A. The minutes of the Waubesa?　Q. Yes.　A. I shall decline to do that.　Q. We are going to try to require you to.　A. Yes, I appreciate that, Mr. Untermyer."

(5) Dahl refused to answer questions as to the date when he began accumulating 72,000 odd or 77,000 odd shares of B.-M. T. stock (p. 483): " Q. All right.　When did you begin accumulating this 72,000 shares of common stock of the B.-M. T.?　A. I respectfully decline to answer that.　Q. Or 77,000 shares?　A. I respectfully decline to answer that question."

(6) Dahl refused to answer questions as to whether " did you buy and sell in market " (p. 484): " Q. Did you buy and sell in the market?　A. I respectfully decline to answer that question. Q. Have you been trading in and out of the market on B.-M. T. and I. R. T. for the last six months?　A. I respectfully decline to answer that question.　Mr. Untermyer: I ask that the witness be instructed to answer these questions.　Chairman Gilchrist: You are instructed to answer the questions.　The Witness: I regret to say that I still must respectfully decline to answer."

(7) Dahl refused and declined to answer questions as to the status of the stock in the Waubesa Corporation and whether in his own name (pp. 484, 485): " Q. As I understand you, you decline to answer any of these questions in respect to dealings in stock in the name of the Waubesa Corporation as though they were transactions in your own name, do you?　A. I do not know what you mean. Q. Well, you do decline to answer, do you not?　A. I decline to answer for the reasons stated.　Q. You decline to answer as to the Waubesa Corporation?　A. Exactly, and I decline to answer as to my personal transactions.　You asked me as to my personal dealings, and I declined to answer that.　Q. Now I am asking you as to transactions with the Waubesa Corporation?　A. I decline to answer.　Q. You decline to answer those, too?　A. Yes.　Q. On

what ground? A. On the ground that it is neither pertinent, relevant nor material to this inquiry."

(8) Dahl refused and declined to give information as to how much money was put into the Waubesa Corporation (p. 486): " Q. Will you get us the information as to how much money was put into this corporation? A. Oh, no, I won't do that. Q. You will not give that, and you do not know whether there was any or not? A. I know that there was property turned over at the time of the organization of the corporation. Q. What was it? A. I decline to answer that. Q. Was it $100 worth? A. I decline to answer that."

(9) Dahl refused and declined to answer questions as to the date when he gave the order on behalf of the B.-M. T. to purchase 19,650 shares of I. R. T. stock (p. 486): " Q. Did you give the order for the purchase of the nineteen thousand and odd shares of stock of the I. R. T. by the B.-M. T.? A. Yes, sir. Q. Sir? A. Yes, I did. Q. When did you give that order? A. I decline to answer that question. Q. Why? A. Because it is neither relevant nor pertinent; has nothing to do with this inquiry. Mr. Untermyer: I ask that the witness be instructed to answer. Chairman Gilchrist: You are instructed to answer the question. The Witness: I still decline to answer. Q. You still decline. When did you begin buying? A. Same answer, Mr. Untermyer."

(10) Dahl refused and declined to answer questions as to whether while buying for the B.-M. T. Company he was also buying for the Waubesa Corporation (pp. 489, 490): " Q. While you were buying for the company, you were also buying for the Waubesa Corporation, were you not? A. I decline to answer as to when I bought for the Waubesa Corporation or when I bought for the company. Q. Were you buying yourself, or the Waubesa Corporation, at the time you were buying for the B.-M. T.? A. That is the same question which I declined to answer a little while ago. I still decline to answer."

(11) Dahl refused and declined to answer questions as to whether or not he was selling I. R. T. stock (pp. 490–512): " Q. Were you selling? A. I decline to answer that question. Q. Did you also make sales for the B.-M. T. during the same period of I. R. T. stock? A. That is the same question that I declined to answer, and I repeat my declination on the same grounds. Q. The chairman instructs the witness to answer and the witness declines to answer: is that right? A. Correct. Q. You will not even tell us whether you sold I. R. T. stock for the B.-M. T. within the last ninety days? A. I have already declined."

(12) Dahl refused and declined to answer questions as to whether 19,650 shares of I. R. T. stock was all which the B.-M. T. purchased

in the last three months; as to whether the B.-M. T. sold any, and as to dates and amounts and prices of various purchases (pp. 509, 510, 522, 525): " Q. All it purchased within the last three months or six months?   A. That is the total stock which the B.-M. T. owns in the Interborough Rapid Transit to-day.   Q. You have said so before, but it does not answer my question.   A. I decline to answer that question.   Q. You decline to answer as to how much stock the B.-M. T. has purchased in the Interborough Rapid Transit within the past three months, do you?   A. I do, except that it has purchased and owns 19,600 shares.   Q. Well, has it purchased more? A. I decline to answer that.   Q. Has it sold any?   A. I decline to answer that.   Q. Has it been engaged in the purchase and sale of the I. R. T. stock within the last three months?   A. I decline to answer that.   Q. You decline also to tell us the dates and the amounts of those various purchases?   A. I do.   Q. And the price at which the purchases were made?   A. I do.   Q. And you decline to answer all these questions as to the purchase and sale of B.-M. T. stock within the last three months or the stock that it now owns — Commissioner Godley: I. R. T. stock.   Q. (continuing) I. R. T. stock, upon the same ground that you stated at the hearing the day before yesterday?   A. No; that it is irrelevant.   Q. No. Is it based on the same ground?   A. I prefer that you let me state my grounds, now.   Q. Don't you think it better to have those deemed repeated in the record?   A. Yes; I think that is all right.   Mr. Miller: Oh, yes, it is.   Q. You read a statement?   Mr. Miller: No, he did not.   The Witness: I did not read a statement.   Q. Would you like to repeat the grounds on which you have refused to answer these questions as to the total purchases of I. R. T. stock by the B.-M. T. within the last ninety days; as to prices, time at which they were purchased within that period, as to the amount of stock of the I. R. T. sold by the B.-M. T. during that time showing this balance of 19,600 shares?   A. My declination as to all of these questions is based upon the ground that it is entirely irrelevant legally and incompetent to the inquiry.   Mr. Miller: May I add an additional ground?   Mr. Untermyer: Yes. Mr. Miller: That the subject of the inquiry is not within the jurisdiction of the commission.   The Witness: Yes.   Mr. Untermyer: May it be deemed and taken that the chairman has instructed the witness to answer each of these questions separately, and that the witness, after the instruction of the chairman to answer each of the questions, has declined as to each of the questions to make answer on the grounds stated?   Mr. Miller: Surely.   By Mr. Untermyer: Q. Is that correct, Mr. Dahl?   A. That is correct.   Chairman Gilchrist: It may be so stated on the record.   (Page 525):

Q. You decline to give any information, do you, as to your dealings in that stock within the last ninety days?   A. Yes, sir.   Q. As to how much you have owned and bought and sold?   A. I decline to give you any information except the information that has been given to you as to the ownership of the B.-M. T.; the number of shares owned, the price or anything else I decline to give.   Chairman Gilchrist: I instruct you to answer.   The Witness: I decline to answer."

(13) Dahl refused and declined to answer questions as to whether he borrowed money from the Chase National Bank to buy I. R. T. stock (pp. 511, 517, 519): " Q. Did you borrow the money from the Chase National Bank with which to buy this I. R. T. stock by the B.-M. T.?   A. I decline to answer that question.   Q. The same direction; and the same refusal?   A. Yes.   (Page 517): Q. At that time didn't the B.-M. T. borrow the money from the Chase National Bank with which to take up the stock?   A. I decline to answer that question.   (Page 519): Q. I would like to know particularly as to how much it borrowed with which to take up the Interborough stock from Hayden, Stone & Company?   A. I decline to answer that question."

(14) Dahl declined and refused to answer questions as to how much I. R. T. stock the B.-M. T. has owned at any one time (p. 515): " Q. And when you said that the B.-M. T. only acquired six per cent. of the stock of the I. R. T. you meant, did you not, that that is all it owned at the present time?   A. I have never said anything else on the subject, except that that is what it does own at the present time.   Q. But how much has it owned at any one time?   A. The declination is on the same ground."

(15) Dahl refused and declined to answer questions as to how much I. R. T. stock the B.-M. T. has sold in the last three months (p. 516): " Q. No, but how much they have owned; you won't tell us how much I. R. T. stock they have sold within the last three months; you will not tell us that?   A. I decline to answer the question.   Q. Whether or not they have been trading in and out of the market within that time in I. R. T. stock you won't tell us?   A. I decline to answer the question."

(16) Dahl refused and declined to answer questions as to whether the B.-M. T. Company and Messrs. Dahl, Chadbourne and Wiggin have been trading in and out of the market in I. R. T. stock in the last ninety days (p. 516): " Q. Whether you, Mr. Chadbourne and Mr. Wiggin have been trading in and out of the market in Interborough stock at the same time, you won't tell us?   A. I decline to answer the question.   Q. All on the same grounds?   A. All on the same grounds.   Mr. Untermyer: I ask the chairman to

instruct the witness to answer these questions. Chairman Gilchrist: You are instructed to answer the questions. The Witness: I respectfully decline."

(17) Dahl refused and declined to answer questions as to how long the brokerage firm of Hayden, Stone & Co. have been carrying I. R. T. stock for the B.-M. T. Company (pp. 521, 522): " Q. Hayden, Stone & Company had been carrying this I. R. T. stock for you, had they not? A. Until it was taken up on May 10. Q. How long had they been carrying it? A. I decline to answer that question. Q. Why, because it might disclose when you — A. I decline to answer that question on the same grounds stated. Q. And do you decline to tell us (I would like this specifically) anything about the time, the dates, the amounts, prices, the circumstances under which the B.-M. T. acquired this Interborough stock? A. I decline to tell you anything about it, except the amount of stock which we now own and what it cost us, on the same ground. Q. Yes. Mr. Untermyer: I ask that the witness be required to answer that question. Chairman Gilchrist: You are instructed to answer that question. The Witness: The declination is the same."

(18) Dahl refused and declined to answer questions as to whether the certificates in the Waubesa Corporation, which is Dahl's family corporation and dominated by him, were indorsed in blank (p. 525): " Q. You do not have these stock certificates wandering around. They are indorsed in blank? A. I may have a couple of boxes. I do not know how many. Q. They are indorsed in blank? A. I decline to answer that question. Q. But they are indorsed in blank and put in your possession so as to be negotiable? A. I said to you that I decline to answer your question. Mr. Untermyer: I ask that the witness be required to answer the question. Chairman Gilchrist: I instruct the witness to answer. The Witness: I respectfully decline to answer."

(19) Dahl refused and declined to answer questions as to whether he directed the purchase by the B.-M. T. Company of I. R. T. stock after he had acquired his own I. R. T. stock (p. 526): " Q. Do you decline also to tell us whether you authorized or directed the purchase by the B.-M. T. of I. R. T. stock after you acquired your I. R. T. stock? A. I decline to answer. Q. Don't you see what the bearing of that might be? A. I see perfectly. Q. And you do not think you want to give that information? A. Exactly. Q. As to whether you bought for yourself first and bought for the company later? A. Exactly. Q. You do not want to give that information? A. I decline to answer the question.

(20) Dahl refused and declined to answer questions as to whether he had been in the Stock Market the last day or two (p. 527):

" Q. Have you been in the market in the last day or two?   A. Oh, that is something I won't tell you.   Q. What?   A. That is something I won't tell you.   Q. You decline to answer that?   A. Yes."

(21) Dahl refused and declined to answer questions as to the dates and prices of purchases of B.-M. T. stock, totaling about 89,000 shares (p. 529): " Q. How long have you held them?   A. I decline to answer that.   Q. When did you buy them; how much did you pay for them?   A. I decline to answer."

In order to resolve the problem of materiality and pertinency it is necessary to review some of the facts disclosed in the voluminous volumes of testimony.

The Brooklyn-Manhattan Transit Company, ordinarily referred to as the " B.-M. T.," is a corporation organized under the Stock Corporation Law of this State. Its rapid transit lines consist of the so-called Brooklyn subways, which are owned by the city, and certain elevated lines, some of which are owned by subsidiaries of the B.-M. T. and some by the city. The subways are leased to the New York Rapid Transit Corporation, a subsidiary of the B.-M. T., and all of whose stock and bonds are owned or controlled by it. These subways are subject to the city's right of recapture at cost, plus fifteen per cent. The chairman of the Commission deposes that a proposition to recapture them may constitute a substantial portion of the readjustment plan to be formulated by the Commission. At the present time the B.-M. T. pays dividends of six per cent per annum on its preferred stock and four per cent per annum on its common stock. It apparently is in good financial condition and its subway lines at least are profitably operated.

The Interborough Rapid Transit Company, usually referred to as the " I. R. T.," operates rapid transit lines in Manhattan in the city of New York and into Brooklyn. It is a public service corporation. The title to the lines is vested in the city, which has given a lease thereof subject to the right of recapture of that portion of the subways built under the so-called " Dual Contracts." The I. R. T. subway earnings would entitle it to pay substantial dividends. While the I. R. T. in the past has paid well, at the present time it pays no dividends and concededly is without prospects of paying any. Practically all its substantial subway earnings are absorbed by its guaranty of six per cent, subsequently reduced to five per cent, on the $60,000,000 of outstanding stock of the Manhattan Elevated Lines operating the elevated railroads.

Dahl is chairman of the board of directors of the B.-M. T. Corporation and, according to Marston, its secretary-treasurer, is the " guiding genius " of the company. He was formerly a vice-president of the Chase National Bank, of which the witness Wiggin,

who made much similar refusals to answer, was formerly president and is now chairman of the board of directors. The Chase National Bank financed some of the stock transactions of the B.-M. T., including those in the I. R. T. stock. Dahl was also formerly a partner in the stock brokerage firm of Hayden, Stone & Co. Through this firm large amounts of traction stock appear to have been purchased by Dahl and other stockholders in the B.-M. T., and a large volume of such stock stood in its name until recently.

Dahl's family corporation, the so-called Waubesa Corporation, owns 77,083 shares of B.-M. T. common stock and 12,436 shares of B.-M. T. preferred stock. It also owns 6,600 shares of I. R. T. stock. While Dahl first testified that his wife owned all the Waubesa Corporation's stock, he ultimately conceded on the record that he assumed as full responsibility as though he owned it individually.

By the admission of Dahl and another witness, Wiggin, the B.-M. T. and the I. R. T. are competing companies.

The purchases of all stock by the B.-M. T., including its purchases of I. R. T. stock, were made by Dahl's directions and he acted on its behalf in making them. It is conceded by the B.-M. T. that it now owns about 19,650 shares of I. R. T. stock. Whether it recently has owned more, and whether it may even now own more, is shrouded in some doubt. The refusals to answer, above adverted to, make it impossible to state definitely.

Dahl first testified that he bought I. R. T. stock on behalf of the B.-M. T. because he regarded it as " a good buy " and believed that ultimately there would be consolidation, with a raised carfare, and denied purchasing the stock for obstructive purposes in connection with the proposed plan of readjustment. However, he admitted towards the close of the hearings that the purchase was made in order to give the B.-M. T. a " voice " and influence in the contemplated dealings between the Commission and the I. R. T. with relation to the proposed readjustment plan.

The status of Wiggin reflects considerable light on Dahl's refusals to answer. Wiggin, an associate of Dahl in the directorate of the B.-M. T., is chairman of the board of directors of the Chase National Bank and also chairman of the finance committee of the B.-M. T. He is a director of the New York Rapid Transit Corporation, which is dominated and controlled through stock ownership by the B.-M. T. The B.-M. T. has close relations with the Chase bank. At present it has some $3,200,000 outstanding there in loans. The Chase bank loaned $900,000 to the B.-M. T. on May 10, 1927, secured by stock of the I. R. T. Company. It was about that date that this stock was taken up by the B.-M. T. from the stock brokerage firm of Hayden, Stone & Co., of which Dahl was at one time

a member. Dahl was also formerly a vice-president of the Chase National Bank. Wiggin owns 20,000 shares of the preferred stock of the B.-M. T. and 38,500 shares of common stock. He also owns 3,600 shares of the I. R. T. stock.

Mr. Chadbourne, a New York attorney associated with Dahl and Wiggin in the B.-M. T. Company as a large fellow stockholder, but not an officer or director, owns 72,216 shares of B.-M. T. common stock and 9,800 shares of I. R. T. stock. Chadbourne made refusals to answer questions substantially similar to those on the part of Dahl and Wiggin.

A large proportion of the stock of the I. R. T. was and still is in the names of brokers. The owners in fact are undisclosed. Much of the traction stock purchased and owned by Dahl, Wiggin and Chadbourne was, until immediately prior to the date of the present investigation, in the name of local stockbrokers, including Hayden, Stone & Co.

The record indicates that Dahl, Wiggin and Chadbourne recently purchased a large block of stock of the I. R. T. on their own behalf and that a considerable amount was also bought on behalf of the B.-M. T. With reference to the objects and purposes of the B.-M. T. in connection with these purchases and sales, the testimony of its secretary-treasurer, Marston, and of Wiggin, is illuminating. Marston stated that the B.-M. T. at the time of his testimony owned 19,650 shares of I. R. T. stock. He also stated that the two companies are competing lines, at least in Manhattan, and both Wiggin and Dahl agreed with him in this respect. Marston did not know who gave authority on the part of the B.-M. T. for the purchase of its stock in the I. R. T. According to him there were made no written entries of the transaction in its books. Dahl, the chairman of the board, simply stated to Marston he had bought the I. R. T. stock for the B.-M. T. and had consulted with four of the six members of its finance committee, including Wiggin, the chairman, before making the purchase. Dahl did not state when he purchased the shares. The executive committee of the B.-M. T. ratified Dahl's action in purchasing this stock on May 9, 1927. On the following day the stock was taken up by the B.-M. T., through the Chase National Bank, from the stock brokerage firm of Hayden, Stone & Co. The bill of the stockbrokers rendered to the B.-M. T. Company showed no dates of the purchases of the I. R. T. shares, but merely gave their number and average price. That there were opportunities for " irregularities " in this method of doing business was admitted by Marston.

Dahl in his testimony conceded he gave the order as chairman of the board of the B.-M. T. for the purchase on its behalf of the

Supreme Court, September, 1927.      [Vol. 130

I. R. T. shares referred to by Marston, but refused to testify when or under what circumstances he began this purchasing. He also refused to state how many shares beyond 19,650 the B.-M. T. had purchased in the I. R. T. He refused to state whether the B.-M. T. was recently engaged in purchasing and selling I. R. T. stock, though admitting that all such purchases and sales are made by his direction and under his auspices. He further refused to state how much I. R. T. stock has been owned by the B.-M. T. at any one time, and to what extent the B.-M. T. sold I. R. T. stock during the three months preceding his testimony on June 8 and 10, 1927, and whether he had made sales of I. R. T. stock for the B.-M. T. within that period. He did claim, however, that he was " quite certain " it now owns 19,600 shares.

The refusals on the part of Dahl were accompanied by refusals on the part of Wiggin, Chadbourne and other witnesses.

Wiggin, in the first part of his testimony, agreed with Dahl's statement that the purchases of the I. R. T. stock were made by the B.-M. T. because they were a " good buy " and because of his belief in ultimate consolidation of the companies and a raised carfare. Both witnesses at first denied that the purchases of I. R. T. stock were made by the B.-M. T. for any obstructive purposes. Indeed, Wiggin first claimed that the B.-M. T. purchases of shares of stock in the I. R. T. were made because they were " an *excellent investment* for the B.-M. T.*" It appeared from the later testimony of Wiggin, and ultimately from the testimony of Dahl as well, that the purchases in fact could hardly be deemed " a good buy " or " an excellent investment," but were made for other reasons, including, according to Wiggin, the purpose of influencing the dealings between the Transit Commission and the I. R. T. pursuant to any contemplated plan of readjustment. Wiggin, after first stating that he knew the I. R. T. stock paid no dividends, and that he saw no hope of such except in the event of increased carfare, and that he knew the I. R. T. had been " in dire straits," testified that he had in mind, when the I. R. T. stock was purchased by the B.-M. T., that it (the B.-M. T.) should have " a voice " in the treatment of the I. R. T. by the Transit Commission and the city.

Wiggin's testimony on this subject is as follows (Record, pp. 655, 656): " Q. So you bought in in order to have an influence, did you, on the negotiation between the city and the Interborough Rapid Transit? A. *We hoped we might have some influence.* Q. I say you bought in for that purpose? A. We hoped we might have some influence. Q. I say you bought in for that purpose? A. Not entirely. Q. No, but you bought in order to influence that negotiation? A. *In order to have something to say.* Q. If you had not

bought in you would not have cared whether the city made a good bargain or a poor bargain, would you? A. Yes, indeed, I would. Q. From what point of view? A. Because we are in the same line of business. Q. But suppose the city did not want your property, but did want the other, why should you be interested in the fate of the I. R. T.? A. Because we are in the same line of business. Q. They are competitors, aren't they? A. Well, hardly. *Yes, there are some lines that are parallel.* Q. So you bought in for the purpose of having a say as to what the city could accomplish with your competitors? A. *We hoped to have something to say.* Q. And so that if the city made too good a bargain with the I. R. T., or the I. R. T. made too poor a bargain, you could come in and stop it? A. I do not know what our powers would be. I do not know what power we would have. Q. Whatever power you would have, you would try to exercise? A. *We would try to see that it was a fair trade.*" (Italics mine.)

Wiggin further admitted that the I. R. T. stock purchases were made by the B.-M. T. so that the B.-M. T.'s " influence " might thereby be employed to " partially " obstruct any dealings between the Transit Commission and the I. R. T. unless the I. R. T. was to secure from the city a sum which Wiggin might regard as a fair price. Wiggin's testimony (Record, p. 659) in this respect reads as follows: " Q. But when you bought for the B.-M. T., you had in mind that it should have a say in the negotiations between the city and the I. R. T. for the purchase of that property? A. *That it should have a voice.* Q. A stockholder's voice? A. Yes, sir. Q. *So that if you thought the price was not fair, you could use your influence to stop it?* A. *Yes, sir.* Q. *Stop the sale?* A. *Yes, sir.* Q. *So that your real purpose was to obstruct the dealings between the city and the I. R. T. unless you believed that the I. R. T. was getting what you regarded as a fair price?* A. *Partially.*" (Italics mine.)

It becomes quite manifest from these admissions and from similar ones made by Dahl in his testimony on July 22, 1927, that the I. R. T. stock was purchased by the B.-M. T., in part at least, in order to influence and partially to obstruct the negotiations between the I. R. T. and the city, by which Wiggin and Dahl presumably meant the Transit Commission.

With this background in mind, the specific questions must now be considered.

In the helpful brief submitted by Dahl's learned counsel the twenty-one groups of questions set forth under the Commission chairman's headings above quoted are grouped in the following order, which, for purposes of convenience, may well be adopted:

" 1. *Questions as to Waubesa Corporation.* Gilchrist headings (1), (2), (3), (4), (7), (8), (10) and (18).

" 2. *Questions as to when Dahl bought and how much he paid for the stock of the B.-M. T. or I. R. T. which he (or the Waubesa Corporation) owns at the present time.* Gilchrist headings (5), (19) and (21).

" 3. *Questions as to when the B.-M. T. purchased its holdings of I. R. T. stock, the dates and amounts of specific individual purchases making up its admitted present holding of 19,650 shares, and how much I. R. T. stock the B.-M. T. has owned at any time prior to the present time.* Gilchrist headings (9), (12), (14) and (17).

" 4. *Questions as to antecedent buying and selling in the market by Dahl or the B.-M. T. or others in either B.-M. T. or I. R. T. stock.* Gilchrist headings (6), (11), (15), (16) and (20).

" 5. *Questions as to money borrowed by the B.-M. T. to buy I. R. T. stock.* Gilchrist heading (13)."

The questions in group 1, relating to the Waubesa Corporation, covered by Gilchrist headings (1), (2), (3), (4), (7), (8), (10) and (18), need not be answered, for the reason that while Dahl apparently evaded the issue in his early answers, declaring that his wife owned all the corporate shares, he ultimately assumed full responsibility for the Waubesa Corporation and its stock purchases, and stated that he was willing, for the purpose of this proceeding, that it should be considered as though he personally owned all the Waubesa shares (Record, p. 531). The above subheadings relate to such questions as into whose bank account the Waubesa Corporation dividends were paid; whether these dividends were put into Mrs. Dahl's bank account or into Dahl's; whether the Waubesa Corporation borrowed money to carry stock purchased by it; whether the Waubesa Corporation had dealt in anything but Stock Exchange securities; whether Dahl would produce the minutes of the Waubesa Corporation; what was the amount of money put into the Waubesa Corporation; whether the share certificates in the Waubesa Corporation were indorsed in blank and put into Dahl's possession so as to be negotiable by him. It is not material or necessary to investigate this subject, because Dahl has affirmatively assumed responsibility for the Waubesa Corporation and its doings. Under these circumstances there is no need for going into the affairs of the witness in connection with the Waubesa Corporation. They are irrelevant, immaterial and foreign in the light of the witness's final admission.

The next, and second, group of questions relates to when Dahl bought and how much he paid for the stock of the B.-M. T. or I. R. T. which he, or the Waubesa Corporation (which he controls), owns at the present time, comprising Gilchrist headings (5), (19) and (21).

Gilchrist heading (5) refers to a question which asks when Dahl began accumulating the shares of common stock of the B.-M. T. which he stated and admitted he now owns. Heading (19) is along the same line, inquiring whether he directed the purchase by the B.-M. T. of I. R. T. stock after he had acquired his own I. R. T. stock, and whether he bought for himself first and for the B.-M. T. company later. Gilchrist heading (21) refers to questions which inquire as to the dates and prices of Dahl's own purchases of B.-M. T. shares.

Under the authority of the leading case of *Matter of Barnes* (204 N. Y. 108) the declinations of Dahl to answer the foregoing questions were founded in reasonable cause and legal excuse, and cannot constitute the basis of an order of commitment.

The facts of the *Barnes* case, briefly stated, were these: The State Legislature in the year 1911 adopted a concurrent resolution of the New York Senate and Assembly authorizing the appointment of a special committee of the Legislature with power to investigate charges of alleged misfeasance, dishonesty, extravagance and corruption in connection with the city and county administrations of Albany, N. Y., and to report back to the Senate with its recommendations. The resolution authorized and empowered the committee " to subpœna and compel attendance of witnesses, including public officers and employees, and the production of books and papers, including public records and documents, to administer oaths, take proof and testimony," etc. The committee subpœnaed Mr. Barnes, at that time a powerful Republican leader in Albany. He was shown to be a stockholder in the J. B. Lyon Company, a printing corporation having relations with certain public officials in Albany. Barnes admitted the number of shares which he held, but refused to state when he acquired the stock or how much he paid for the stock or whether he paid anything for it. Thereupon Barnes was cited for contempt. The Court of Appeals held that the questions which the witness declined to answer were not legal or pertinent, and that, therefore, he was not required to answer them.

Judge GRAY in his opinion (204 N. Y. 118) states the rule as follows: " The five questions, which the witness refused to answer and which are now involved, are these: ' (1) Mr. Barnes, you got your stock, (referring to the stock of the Lyon Company), in 1901, is not that true? (2) Did you pay anything for your stock in the Lyon Company? (3) Did you talk to Mr. Lyon about the consideration that you paid for your stock at the time that you saw him? (4) Did you pay anything for it? (5) Was it given to you? ' The J. B. Lyon Company was a corporation, which had furnished the county of Albany with printing for a period of ten years, and

31

Barnes was the owner of 750 out of an issue of 3,000 shares of capital stock. He testified to having been a ' leader ' of the Republican party, a party for some years dominant, politically, in Albany county; employing that term, as he said, to mean ' a man whose advice is taken largely by the men of the political party, with whom he is associated.' As stated by Justice KELLOGG, at the Special Term, ' the investigation was being had as to whether a person in that position had acquired a substantial stockholding interest in a company, which furnished printing to a large amount to the political subdivision in which he was a figure of power, without any adequate compensation therefor, and whether this species of patronage had been given to the company in return for an ownership, or interest.' * * * The fact of his interest in a company, which was contracting and dealing profitably with the municipal departments and public officials, was made known and the committee could make such inference, and deduce such conclusions therefrom for its report, as its members might deem to be justified. The committee could not be aided, within the proper legislative province of its inquiry, by the knowledge of how Barnes had obtained his stock. *He owned it and the time when he got it, or the consideration for it, were matters quite immaterial and beyond the jurisdiction of the committee to inquire into.*" (Italics mine.)

In the instant case, to paraphrase the language of Judge GRAY, Dahl admitted both the ownership of stock in the I. R. T. and B.-M. T. and the amount thereof, " and the time when he got it, or the consideration for it, were matters quite immaterial " and beyond the jurisdiction of the Commission " to inquire into." In the present case, as in the *Barnes* case, the fact of the actual ownership of the shares of stock of the two corporations in question has been disclosed. Here, as in the *Barnes* case, it is sought to inquire as to when and on what terms and for what consideration the shares were acquired. This, under the controlling authority of the *Barnes* decision, may not be done, nor can such information in any conceivable way be regarded as aiding the Transit Commission in its task of preparing a plan of readjustment as directed by article VI, section 106, of the P. S. C. Law. It is difficult to conceive of a precedent which could be more directly in point and, in principle and in doctrine enunciated, more controlling upon this court.

The learned counsel for the Transit Commission argued that every case " stands upon its own facts," and denied that there is any such thing as " a precedent as to what is material and pertinent," and, in fact, that the *Barnes* case may be disregarded. While recognizing that the law is not a " mere game " (Ehrlich, Die Juristische Logik, p. 295), and that the attainment of substantial

justice is fully as important as a too slavish and meticulous adherence to outworn precedents, nevertheless, as well said by Chief Judge CARDOZO, " adherence to precedent should be the rule and not the exception." (Cardozo, The Nature of the Judicial Process, 149.)

The labor of the courts, indeed, would be immeasurably increased and magnified if past decisions constituted no safe guide, and if " one could not lay one's own course of bricks on the secure foundation of the courses laid by others who had gone before him." (Cardozo, op. cit. 149.)

While it is a fallacy to conceive that precedents constitute the only dynamic force at work in the development of our legal system, at the same time it must be conceded that " the law is a logical development, like everything else " (Holmes, Collected Legal Papers, 180), and the axioms of judicial pronouncements may not be lightly flung aside, and assuredly not by a tribunal for hearings at *nisi prius*. (See, too, 1 Kent Comm. *476.)

It is also urged upon the court's attention that two judges of the Court of Appeals dissented from the decision in the *Barnes* case and " wrote a very emphatic opinion to the effect that the questions asked Mr. Barnes were both material and pertinent." But this court, irrespective of what its personal views may be, if indeed it were seemly to express these, is bound to follow the authority of the *Barnes* case, for if the dissenting judges therein thought that the questions asked were legal and pertinent, is it not transparently obvious that the majority of the court held and authoritatively adjudged the precise contrary, deciding that the questions were not material, pertinent or legal?

The court at *nisi prius* is not at liberty to disregard the ruling of the five judges constituting a majority of the Court of Appeals and adopt the view of two dissenting judges.

Moreover, the *Barnes* case has never been limited or questioned. It has been repeatedly cited and followed, as, for example, in *Matter of Hirschfield* v. *Hanley* (228 N. Y. 346, 349), where the unanimous Court of Appeals, citing the *Barnes* decision, declared that " the courts should and will be quick and firm in halting the exercise of those powers for irrelevant, illegitimate or oppressive examinations or purposes." (See, also, *Matter of Public Service Comm.*, 162 App. Div. 371, 376; *People* v. *Foster*, 204 id. 295; affd., 236 N. Y. 610; *Matter of Foster*, 139 App. Div. 769, 777; *Matter of Nicosia*, 180 id. 427, 429; *People ex rel. Sabold* v. *Webb*, 5 N. Y. Supp. 855, 859.)

The Supreme Court of the United States has also passed upon this subject in the case of *Harriman* v. *Interstate Commerce Com-*

*mission* (211 U. S. 407). In that case the Interstate Commerce Commission undertook, pursuant to section 12 of the Interstate Commerce Act, to exercise its power to keep itself informed with respect to the management of common carriers and to obtain from them the complete information necessary to enable the performance of the duties imposed by law upon the Commission. For that purpose the Commission instituted a general investigation concerning combinations of common carriers, the relations existing between them, their practices and methods, etc., in order to discover any possible violations of the statute. Mr. Harriman was called as a witness by the Commission under an order made by it in this investigation. He was then president and chairman of the executive committee of the Union Pacific Railroad Company, as well as a director of the railroad. The Commission was investigating the relations of that railroad with other roads, both parallel and connecting. He was asked such questions as when he acquired certain stock in certain railroads, what he paid for such stock, whether it was acquired by a pool, and the like. The Commission insisted that this information might aid it in recommending additional legislation to Congress. The witness refused to answer all questions of this nature and the Supreme Court of the United States in all respects sustained his refusals to answer. Mr. Justice HOLMES (at p. 417) stated as follows: " And the result of the arguments is that whatever might influence the mind of the commission in its recommendations is a subject upon which it may summon witnesses before it and require them to disclose any facts, no matter how private, no matter what their tendency to disgrace the person whose attendance has been compelled. If we qualify the statement and say only, legitimately influence the mind of the commission in the opinion of the court called in aid, still it will be seen that the power, if it exists, is unparalleled in its vague extent." (See, also, *Federal Trade Comm.* v. *Am. Tobacco Co.*, 264 U. S. 298; *Ellis* v. *Interstate Commerce Commission*, 237 id. 434.)

The foregoing cases are authorities controlling upon this court which it is not at liberty to disregard.

Furthermore, the burden of proof is plainly upon the Transit Commission to establish the materiality of the testimony sought to be elicited by the interrogatories.

In *People* v. *Foster* (*supra*) the Court of Appeals in affirming an order of the Appellate Division, First Department, setting aside a conviction of criminal contempt based upon Foster's refusal to answer questions asked him by the Lockwood Committee, stated as follows: " Order affirmed on ground that the People did not discharge burden of proving that reports which defendant refused to produce were material."

It is also urged that these questions are material and proper because of the alleged duty of the Transit Commission to inquire into the " character " and " integrity " of the management of the B.-M. T. in order to determine the nature of management and control which it will recommend in its proposed plan of readjustment. Upon this theory there is no limit beyond which the examination might not proceed. It would justify an examination of the witness as to any and all transactions of his past life. A man's character and integrity are not proper subjects for such investigation by an administrative body of the nature of the Transit Commission. Nor may the Commission conduct an inquisition into Dahl's personal stock dealings in order to unearth alleged iniquities as a means for controlling the future conduct of others. If Dahl has been guilty of any misbehavior and if he has in any respect betrayed the interests of those who trusted him, those are proper matters to be considered in a possible stockholder's action (*Continental Securities Co.* v. *Belmont,* 206 N. Y. 7), or by the officials intrusted with the administration of the criminal law; but they are not involved or comprehended within article VI of the P. S. C. Law, no matter how liberally construed.

The eminent special counsel for the Transit Commission deserves commendation for his worthy efforts to expose that which he considers to be reprehensible misconduct, but the proper forum is either the equity courts in a stockholder's action, the criminal courts in a prosecution by the People of the State, or possibly the State Legislature, which may desire to investigate and to enact legislation to meet the abuses which it is claimed now exist. It may well be that in a proceeding of one of the natures above indicated the materiality of the questions propounded to the witness might not well be denied. It may further well be that a statute might properly be enacted in order to forbid the irregularities and derelictions of duty of which counsel complains. But the propounding of questions which have not been affirmatively established to possess a material, relevant and legal bearing upon the purposes of the present transit hearing and investigation is not here warranted. Every argument applicable to the questions condemned by the Court of Appeals in the *Barnes* case applies with equal force to the questions propounded to Dahl concerning his personal stock acquisitions in shares of the B.-M. T. or the I. R. T., respectively, in the instant case. (See, also, *Matter of Pacific R. Comm.,* 32 Fed. 241, 263; *Federal Trade Comm.* v. *Am. Tobacco Co.,* 264 U. S. 298, 305, per HOLMES, J.)

The foregoing discussion disposes of the second group of questions comprising Gilchrist headings (5), (19) and (21), which, for the reasons above stated, need not be answered by the witness.

Group 5, comprising Gilchrist heading (13), may be very briefly disposed of. It consists of questions as to money borrowed by the B.-M. T. for the purchase of stock in the I. R. T. Thus, the witness declined to answer whether the money for this purchase was borrowed by the B.-M. T. from the Chase National Bank, and at what time, and in what amount. These questions are immaterial for the purpose of the present investigation. It was admitted that the money was borrowed from the Chase National Bank, and the witness stated, as appears from the statement of facts in this opinion, that the B.-M. T. has $3,200,000 of loans outstanding in the Chase bank, and that one of these loans was in the sum of about $900,000 on or about May 10, 1927. The necessary facts all appear. The questions which the witness refused to answer are of no consequence. For every purpose of this investigation everything essential appears in the record. The court does not overlook the fact that Wiggin is chairman of the board of the Chase National Bank and at the same time chairman of the finance committee of the B.-M. T. Nor does the court overlook the fact that Dahl is a former vice-president of the Chase National Bank and now chairman of the board of the B.-M. T., and formerly a partner in the stock brokerage firm of Hayden, Stone & Co., from which firm the stock was taken up on May 10, 1927. It may be that such practice of borrowing in this manner is the subject of legitimate criticism. Possibly legislation should provide against the situation which the zealous special counsel had in mind, but the propriety or impropriety of these practices, their justification or lack of it, are not material in the present investigation.

For these reasons, therefore, the questions under Gilchrist heading (13), under group 5, need not be answered.

The questions in group 3 comprise Gilchrist headings (9), (12), (14) and (17), and relate to when the B.-M. T. purchased its holdings of I. R. T. stock, the dates and amounts of specific purchases making up the present holding, and how much I. R. T. stock the B.-M. T. has owned prior to the present date, and more specifically within ninety days prior to the date of the commencement of the investigation.

The questions under Gilchrist heading (9) are immaterial, under the controlling authority of *Matter of Barnes* (*supra*). They relate to when the order was g ven and under said decision are neither relevant nor pertinent and have nothing properly to do with this inquiry. Nor was any foundation laid to establish the relevancy and materiality under the doctrine of *People* v. *Foster* (*supra*).

The questions under Gilchrist heading (17) are improper and immaterial, for the same reasons. They relate to how long the

brokerage firm of Hayden, Stone & Co. had been carrying I. R. T. stock for the B.-M. T. Co. These questions are simply an attempt to ascertain by indirection the time of purchase, which is immaterial for reasons already stated, and under the authority of *Matter of Barnes (supra)* and *Harriman* v. *Interstate Commerce Commission (supra)*.

On the other hand, some of the questions under Gilchrist headings (12) and (14) are material. Under heading (12), Dahl declined to answer questions as to whether the 19,600 shares of I. R. T. stock, which were conceded to be owned by the B.-M. T. at the time of his testimony, were *all* which the B.-M. T. purchased within three months preceding that date, and whether the B.-M. T. had made sales and purchases of said stock within that period. Under heading (14), Dahl refused to answer questions as to how much I. R. T. stock the B.-M. T. has owned at any one time within that period. As the two chief factors represented by transit lines that would feature the proposed plan are the I. R. T. and (through its subsidiary, the New York Rapid Transit Corporation) the B.-M. T., which the witness conceded to be competing companies, the materiality of the extent of the holdings by B.-M. T. of I. R. T. stock purchased partially at least for the purpose of obstructing the dealings between the city and the I. R. T., becomes evident. The facts as to said holdings are shrouded in doubt and the witness should also answer the questions as to the amount owned by the B.-M. T. within the ninety-day period referred to. The facts as to stockholding of the B.-M. T. in the I. R. T., a public service corporation admittedly subject to the jurisdiction of the Commission and directly involved in the present investigation, are material. So, also, under the circumstances shown by the record and hereinbefore set forth, as to the amount of said stock owned by the B.-M. T. within a comparatively recent period of time. In fact the B.-M. T. may own in excess of the amount of I. R. T. holdings which Marston admits. The picture as to stockholders should be complete. The ownership of the stock of the I. R. T. should be disclosed to the Commission in connection with the preparation of a plan of readjustment. The *Barnes Case (supra)* decides nothing to the contrary. Wiggin, Dahl and Chadbourne presented written statements setting forth how much stock they owned in the I. R. T. They admitted both the fact and the amount. They refused to answer *when* they got that stock, and under the *Barnes Case (supra)* they were justified in that refusal. But with regard to the B.-M. T. the situation is quite different. The B.-M. T. has never made full and frank disclosure of its stock ownership in the I. R. T., either at the time of the refusals to

answer on the witness' part or within a reasonable time preceding the investigation. It is true that Marston, a secretary, testified that the B.-M. T. owns 19,650 shares of I. R. T., but Dahl said he was " quite certain " 19,600 shares was the amount. But Marston stated there were no written entries of the transactions. He produced no books. He gave no certified list. In view of this the refusals by Dahl (at whose direction the purchases were made) to further answer seems significant. Dahl would not say *anything* with reference to the acquisitions by the B.-M. T. of I. R. T. stock. Though Dahl may not be required to state when it was acquired or at what prices (*Barnes Case, supra*), he must testify *how much stock* the B.-M. T. owned in the I. R. T. at the date of his testifying and for a reasonable period before. The Transit Commission is entitled to know who the stockholders in the I. R. T. really are and the amount of their stock holdings. (P. S. C. Law, §§ 5, 5-a, 45, 106.) The I. R. T. is a public service corporation and all stockholders therein must give full and frank information as to their holdings. The Commission is not bound to accept the testimony of Marston, which was uncertain on this point. It is entitled to have the sworn statements on this subject of the witness Dahl, who is no mere secretary, but the chairman of the B.-M. T. board and its " guiding genius."

Counsel for the Commission, in urging the materiality of these questions, lays stress upon section 54 of the P. S. C. Law, which limits the amount of stock which a stock corporation may acquire in a railroad corporation to ten per cent. (P. S. C. Law, § 54, subd. 2, as amd. by Laws of 1926, chap. 846.) The answer to this contention is that the P. S. C. Law nowhere confers upon the Transit Commission any power to enforce the prohibition contained in this section. Whether there has been a violation would seem to be within the province of the Attorney-General of the State. Certainly, whether there has been a breach of the prohibition in this section is not a matter involved in the present investigation. (See *People ex rel. New York, etc., R. R. Co.* v. *Willcox,* 200 N. Y. 423, 431; *People ex rel. New York Railways Co.* v. *Pub. Serv. Comm.,* 223 id. 373, 379; *People ex rel. Delaware & Hudson Co.* v. *Stevens,* 134 App. Div. 99; affd., 197 N. Y. 1.) Moreover, the Commission was not and is not purporting to conduct the present investigation in order to determine whether section 54 has or has not been violated. The sole purpose of this proceeding is to acquire information material and necessary for the preparation of a readjustment plan. Furthermore, the penalty provided for a violation of section 54 would seem to be prescribed and outlined in the statute itself, to wit, the transaction as a matter of law is a nullity, void and legally non-existent.

Nor does the court regard these questions as material because

they may tend to shed light on an alleged enrichment of the officers and of the public. For reasons above set forth, this is not the time or place, nor the correct form of proceeding, in which such matters may be inquired into.

The questions under headings (12) and (14) are material, nevertheless, for the reasons hereinbefore stated.

This discussion disposes, therefore, of group 3. Summarizing, the questions in said group under Gilchrist headings (9) and (17) have been shown to be immaterial, and need not be answered; whereas with regard to the questions under Gilchrist headings (12) and (14), the questions therein involved which relate to the amount of the holdings of the B.-M. T. in the I. R. T., both at the time of the witness's refusal to answer and for the period preceding, are material and, therefore, must be answered.

The questions under group 4 relate to antecedent buying and selling in the market of B.-M. T. or I. R. T. stock on the part of Dahl or the B.-M. T. or others. This group comprises Gilchrist headings (6), (11), (15), (16) and (20). Of these headings the questions under headings (6), (16) and (20) have not been shown pertinent and material. Heading (6) relates to questions whether Dahl was buying and selling in the stock market, and more particularly whether he was trading in and out of the market in B.-M. T. and I. R. T. stock during the last six months. These interrogatories are not material for the reasons above outlined and under the controlling decisions herein referred to. Counsel for the witness argues that these questions constitute " an effort to pry into his personal and private business." With this contention the court does not agree. Whether affairs are " personal and private " is not the test. The true criterion determining whether the witness must answer is whether the questions are material and pertinent. As, under the authorities, they are neither of these, the witness should not be required to answer.

Under Gilchrist headings (16) and (20) Dahl refused to answer questions whether he, Chadbourne and Wiggin were trading in and out of the stock market in I. R. T. stock within the ninety days preceding the date of giving the testimony and whether he personally had been in the stock market during the preceding day or two. For reasons already stated, these inquiries are not material and, therefore, need not be answered.

On the other hand, the questions under Gilchrist heading (11), as to whether or not the witness was selling I. R. T. stock for the B.-M. T. within ninety days preceding his testimony, are held to be material for reasons already stated as to questions within headings (12) and (14). The very first question under Gilchrist heading (11) would not seem, however, to be material, and must be

differentiated and excepted from the other questions under this heading. It reads as follows: " Were *you* selling? " and apparently relates solely to Dahl's individual sales as distinguished from his sales on behalf of the B.-M. T. to which the remaining three questions under Gilchrist heading (11) refer.

With regard to Gilchrist heading (15), the same remarks apply. The questions therein refer to Dahl's refusal to answer questions as to how much I. R. T. stock the B.-M. T. has sold within the three months preceding the testimony of the witness. The materiality of these questions has already been shown. Though the propriety of the B.-M. T. dealing in the stock of the I. R. T., a competing public service company, is not directly involved in the present inquiry, and from that standpoint these questions are not pertinent, yet, on the other grounds hereinabove stated, they are material and should be answered.

It has been, indeed, a difficult matter to dispose of this motion, predicated upon so voluminous a record, within the limited amount of time available. The court has endeavored to survey the matter patiently and deliberately, yet with as much expedition as the importance and gravity of the proceeding would permit.

For the reasons above stated the court is constrained to deny the motion as to Gilchrist headings (1), (2), (3), (4), (7), (8), (10) and (18), under group 1; Gilchrist headings (5), (19) and (21), under group 2; Gilchrist headings (9) and (17), under group 3; Gilchrist headings (6), (16) and (20), under group 4, and Gilchrist heading (13), under group 5. As to Gilchrist headings (12) and (14), under group 3, and (11) and (15), under group 4, the court will require all questions therein to be answered (P. S. C. Law, § 19) which bear on the holdings of the B.-M. T. in the I. R. T., both at the date of the refusals of the witness to testify thereto and for a period of three months immediately preceding that date. Prices and times of purchase and sale need not be given (*Matter of Barnes, supra*), but quantities of purchases and sales, as well as holdings, must be fully and frankly stated. The refusals on the part of Dahl to answer the said questions last referred to are held to be without reasonable cause or legal excuse, and accordingly bring the witness within the specific punitive provisions of the P. S. C. Law, section 19, subdivision 2. Therefore, the court is constrained to hold that the witness Dahl must forthwith give full, complete and truthful answer to the said questions addressed to him by the Transit Commission of the State of New York through its special counsel, and which he has thus far refused to answer, and that in the event of refusal a warrant must issue committing Dahl to jail, to remain there until he shall answer the said questions.

Settle order on notice.